EXHIBIT

A



# AmTrustCyber Policy

## Technology Insurance Company, Inc.

INSURANCE IS PROVIDED BY
THE COMPANY DESIGNATED ON THE
DECLARATIONS PAGE
(A Stock Insurance Company)

**800 SUPERIOR AVENUE EAST, 21ST FLOOR
CLEVELAND, OH 44114**
877-528-7878

## Read Your Policy Carefully

This policy is a legal contract between you and us.  The information on this page is not the insurance contract and only the actual policy provisions will control.  The policy sets forth in detail the rights and obligations of both you and us.  **It is therefore important that you read your policy carefully.**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of the policy.

This policy is signed by the President and Secretary of the insurance company and, if required by State law, this policy shall not be valid unless countersigned on the Declaration page by its authorized representative.

President       Secretary

ILSIGDEC  1015



Technology Insurance Company, Inc.
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

# AmTrustCyber
# DECLARATIONS PAGE

COVERAGE FOR THE INSURED'S DIRECT LOSS APPLIES SOLELY TO INCIDENTS OR EVENTS FIRST DISCOVERED BY THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER IN ACCORDANCE WITH THE TERMS OF THIS POLICY.

COVERAGE FOR CLAIMS BROUGHT AGAINST THE INSURED APPLIES SOLELY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR EXTENDED DISCOVERY PERIOD AND REPORTED TO THE INSURER IN ACCORDANCE WITH THE TERMS OF THIS POLICY.

DEFENSE COSTS ARE PART OF AND NOT IN ADDITION TO THE AGGREGATE LIMIT OF LIABILITY. THE AGGREGATE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS AND THE RETENTION SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE COSTS. THE INSURER SHALL NOT BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY LOSS AFTER THE AGGREGATE LIMIT OF LIABILITY HAS BEEN EXHAUSTED.

| **POLICY NUMBER: TPP1728248 -02** | **PRODUCER:** Acrisure, LLC dba RGS Limited |
| --- | --- |
| | 3310 W. Big Beaver Road, Suite #136 |
| | Troy, MI 48084 |

### ITEM 1. POLICYHOLDER

**Policyholder:** North American Data Security (NADS) RPG on behalf of and including each Member

(Member means any entity actively enrolled in a program participation agreement through a third-party partner pursuant to a written agreement between NADS RPG and such third-party partner)

**Policyholder Address**: 3310 W. Big Beaver Road
Troy, MI 48084

### ITEM 2. POLICY PERIOD

Effective Date: 1/1/2025                          Expiration date: 1/1/2026

Both at 12:01am standard time at the Policyholder's address

### ITEM 3. PREMIUM

Refer to Program Administrator

### ITEM 4. EXTENDED DISCOVERY PERIOD

Extended Discovery Period: 12 Months

Extended Discovery Period Premium: 100% of the Annual Premium

CYDEC 0321



Technology Insurance Company, Inc.
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

## ITEM 5. CONTINUITY DATE

Continuity Date: Policy inception date as applicable to each Member.

## ITEM 6. NOTICE OF CLAIM, LOSS OR CIRCUMSTANCE

Email Address:
AmTrustCyberClaims@amtrustgroup.com

Mailing Address:

AmTrust North America

400 Executive Boulevard, 4th Floor

Southington, CT 06489

ATTN: AmTrustCyber Claims Department

## ITEM 7. LIMITS

Aggregate Limit of Liability: $250,000

| | | | |
|---|---|---|---|
| Business Interruption Waiting Period: | N/A | Business Interruption from Suppliers Waiting Period: | N/A |
| Business Interruption Period of Restoration: | N/A | Business Interruption from Suppliers Period of Restoration: | N/A |

| COVERAGE FOR THE INSURED'S DIRECT LOSS | LIMIT OF COVERAGE | RETENTION |
|---|---|---|
| Ransom Payment: | $ 10,000 | $ 1,000 |
| Data and System Recovery: | Not Covered | N/A |
| Bricking Costs: | Not Covered | N/A |
| Business Interruption: | Not Covered | N/A |
| Business Interruption from Suppliers: | Not Covered | N/A |
| Reputation Harm: | Not Covered | N/A |
| Cyber Event: | $ 50,000 | $ 1,000 |
| Cyber Deception: | $ 10,000 | $ 1,000 |
| Proof of Loss: | Not Covered | N/A |
| Cryptojacking: | Not Covered | N/A |

| COVERAGE FOR CLAIMS BROUGHT AGAINST THE INSURED | LIMIT OF COVERAGE | RETENTION |
|---|---|---|
| Privacy and Network Security: | $ 250,000 | $ 1,000 |
| Regulatory Fines and Penalties: | $ 250,000 | $ 1,000 |
| Payment Card: | $ 250,000 | $ 1,000 |

CYDEC 0321



Technology Insurance Company, Inc.
800 Superior Avenue East, 21st Floor
Cleveland, OH 44114

| Media: | Not Covered | N/A |
| --- | --- | --- |

**ITEM 8. ENDORSEMENTS**

1. CY990012 0321    CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM AND DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

2. IL P 001 01 04    US Treasury Department's Office of Foreign Assets Control (OFAC) Advisory Notice to Policyholders

3. CY990016 0522    NUCLEAR ENERGY LIABILITY EXCLUSION (BROAD FORM)

4. CY990002MI 0321    MICHIGAN AMENDATORY ENDORSEMENT

CYDEC 0321



**COVERAGE FOR THE INSURED'S DIRECT LOSS APPLIES SOLELY TO INCIDENTS OR EVENTS FIRST DISCOVERED BY THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER IN ACCORDANCE WITH THE TERMS OF THIS POLICY.**

**COVERAGE FOR CLAIMS BROUGHT AGAINST THE INSURED APPLIES SOLELY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR EXTENDED DISCOVERY PERIOD AND REPORTED TO THE INSURER IN ACCORDANCE WITH THE TERMS OF THIS POLICY.**

**DEFENSE COSTS ARE PART OF AND NOT IN ADDITION TO THE AGGREGATE LIMIT OF LIABILITY. THE AGGREGATE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS AND THE RETENTION SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE COSTS. THE INSURER SHALL NOT BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY LOSS AFTER THE AGGREGATE LIMIT OF LIABILITY HAS BEEN EXHAUSTED.**

In consideration of the payment of the premium, in reliance upon the information provided to the **Insurer**, and subject to the **Aggregate Limit of Liability** and applicable **Retention**, exclusions, conditions, and other terms of this Policy, the **Insurer** and **Company** agree as follows:

### COVERAGE FOR THE INSURED'S DIRECT LOSS

The **Insurer** will indemnify the **Company** for any of the following first **Discovered** during the **Policy Period**:

#### Ransom Payment

**Ransom Payments** incurred by the **Company** directly resulting from a **Ransom Threat**.

#### Data and System Recovery

**Data and System Recovery Costs** and **Bricking Costs** incurred by the **Company** directly resulting from a **Cyber Event**.

#### Business Interruption

**Business Interruption Loss**, including **Extra Expense**, incurred by the **Company** during the **Period of Restoration** because of a **Business Interruption** directly resulting from a **Business Interruption Event**.

#### Business Interruption from Suppliers

**Supplier Interruption Loss**, including **Extra Expense**, incurred by the **Company** during the **Period of Restoration** because of a **Business Interruption** directly resulting from a **Supplier Interruption Event**.

#### Reputation Harm

**Reputation Loss** incurred by the **Company** during the **Reputation Period** because of a **Reputation Event** directly resulting from a **Cyber Event** or **Ransom Threat**.

#### Cyber Event

**Cyber Event Costs** directly resulting from a **Cyber Event**.

#### Cyber Deception

The **Company's** loss of **Money** or **Securities** directly resulting from a **Cyber Deception**.

CY990001 0422



**Proof of Loss**

Any reasonable and necessary costs for an **Expert** to determine the amount and the extent of any covered **Business Interruption Loss**, **Data and System Recovery Costs**, **Supplier Interruption Loss**, **Extra Expense**, and **Reputation Loss**.

**Cryptojacking**

The **Company's** loss of **Money** directly resulting from **Cryptojacking**.

## COVERAGE FOR CLAIMS BROUGHT AGAINST THE INSURED

**Privacy and Network Security**

The **Insurer** will pay on behalf of the **Insured** any **Damages** and **Defense Costs** arising from a **Liability Claim** first made against an **Insured** during the **Policy Period** for any **Cyber Event**.

**Regulatory Fines & Penalties**

The **Insurer** will pay on behalf of the **Insured** any **Fines and Penalties** and **Defense Costs** arising from a **Regulatory Claim** first made against an **Insured** during the **Policy Period** in response to any **Cyber Event**.

**Payment Card**

The **Insurer** will pay on behalf of the **Insured** any **PCI Payments**, **PCI Investigation Costs** and **Defense Costs** arising from a **PCI Claim** first made against an **Insured** during the **Policy Period** for a **PCI Wrongful Act** that results from a **Cyber Event**.

**Media**

The **Insurer** will pay on behalf of the **Insured** any **Damages** and **Defense Costs** arising from a **Liability Claim** first made against an **Insured** during the **Policy Period** for a **Media Wrongful Act**.

## DEFINITIONS

In this Policy the terms listed below will be defined as follows:

**Additional Insured** means any person or entity that the **Company** has agreed in writing to add as an **Additional Insured** under this Policy prior to the commission of any act for which such person or entity would be provided coverage under this Policy, but only to the extent the **Company** would have been liable and coverage would have been affected under the terms and conditions of this Policy had such **Claim** been made against the **Company.**

**Aggregate Limit of Liability** means the applicable amount specified as such in Item 7. of the Declarations.

**Assumed Under Contract** means any liability assumed by the **Company** in the form of a hold harmless or indemnity agreement executed with any **Third Party** prior to an incident or event giving rise to a **Liability Claim**.

**Bricking Costs** means costs to replace any component of a **Company Computer System** upon which electronic data of the **Company** was stored that is no longer functional as a direct result of a **Cyber Attack**.

> For purposes of this definition, a **Company Computer System** or its components will be deemed no longer functional if they cannot be restored to functionality after reasonable efforts have been made, or if it would be commercially unreasonable to incur costs to restore functionality. The cost to replace all or part of a **Company Computer System** and its components will be determined using the cost to replace items with functionally equivalent items.

CY990001 0422



**Bricking Costs** does not mean costs and expenses to replace any industrial machinery, assets or equipment or any component thereof including, without limitation, any physical devices used in manufacturing, logistics, warehousing, refurbishment or construction.

**Business Interruption** means the complete or partial interruption or the slowdown of the operations of a **Company** for a period of time that exceeds the applicable **Waiting Period**.

**Business Interruption Event** means any:

(A)   **Cyber Attack**;

(B)   **Unplanned Failure**;

(C)   voluntary and intentional shutdown or interruption of any **Company Computer System** by the **Company**, but only to the extent necessary to limit the loss or damage resulting from a **Cyber Event** upon or failure of any **Company Computer System** that would otherwise be incurred by the **Company**; or

(D)   intentional shutdown or interruption by the **Company** of any **Company Computer System** as expressly required by any **Regulator** as a result of a **Cyber Event**.

**Business Interruption Loss** means any **Loss of Profit** sustained by the **Company** and **Extra Expense**.

**Business Interruption Loss** will not include any:

(1)  loss resulting from the suspension, cancellation, or lapse of any lease, contract, license or orders;

(2)  liabilities to any **Third Party**;

(3)  legal expenses or costs;

(4)  consequential loss or loss incurred as a result of unfavorable business conditions;

(5)  **Data and System Recovery Costs**;

(6)  **Supplier Interruption Loss**; or

(7)  **Ransom Payment**.

**Claim** means any:

(A)   **Liability Claim**;

(B)   **PCI Claim**; or

(C)   **Regulatory Claim**.

Multiple **Claims** arising from **Related Events** will be considered a single **Claim** for purposes of this Policy and will be deemed made at the time of the first such **Claim**.

**Company** means the **Policyholder** and any **Subsidiary**.

**Company Computer System** means any **Computer System** under the operation or control of, and either owned or leased by, a **Company**.

**Computer System** means any hardware, software, and firmware used to provide or host computer application services to:

CY990001 0422



(A) create, manage, automate, integrate, interpret, control, process, eliminate, modify, store, retrieve, secure or exchange information; or

(B) create, manage, steer, modify, store, retrieve, secure, analyze, control, or monitor industrial operations.

**Confidential Information** means any information of a **Third Party** held by, or in the care, custody, or control of the **Insured**:

(A) that is subject to any confidentiality agreement or confidentiality provision in a contract or agreement between the **Third Party** and the **Company**; or

(B) that the **Company** is legally required to maintain in confidence, other than:

(1) **Personally Identifiable Information**; or

(2) any information that is lawfully available to the general public or lawfully in the public domain.

**Continuity Date** means the applicable date in Item 5. of the Declarations.

**Cryptojacking** means the unauthorized access or use of any **Company Computer System** to mine for digital currencies that directly results in additional costs incurred by the **Company** for electricity, natural gas, oil, or internet.

**Cyber Attack** means an intrusion into, unauthorized access or use of any **Company Computer System** or, any unauthorized modification, destruction, deletion, distribution or transmission or copying of, or rendering inaccessible, electronic data or software or consumption of computer resources of such **Company Computer System**, by any means, including, but not limited to, denial of service attacks. **Cyber Attack** includes an unauthorized distribution or transmission of malicious code or virus from the **Company Computer System** to the **Computer System** of a **Third Party**.

> **Cyber Attack** also means the loss of use of all or part of a **Company Computer System** caused by a **Third Party**'s reprogramming of software, including firmware, which renders such **Company Computer System**, or any component thereof, useless, unusable, or ineffective with respect to its intended purpose.

**Cyber Deception** means any:

(A) **Fraudulent Instruction**;

(B) **Funds Transfer Fraud**; or

(C) **Telephone Fraud**.

**Cyber Event** means any **Privacy Breach** or **Cyber Attack**.

**Cyber Event Costs** means any:

(A) **Forensic Costs;**

(B) **Data Breach Response Costs**;

(C) **Voluntary Notification Costs**;

(D) **Legal and Regulatory Advice Costs**;

(E) **Public Relations Costs**;

(F) **Cyber Event Guidance Costs**; or

CY990001 0422



(G) **Rewards**.

**Cyber Event Guidance Costs** means the reasonable and necessary costs for an **Expert** to provide guidance and direction to the **Insured** with respect to a crisis directly resulting from a **Cyber Event**.

**Cyber Terrorism** means any actual, alleged, or threatened attack on a **Computer System**, where such attack, whether committed or threatened, is motivated by economic, political, religious, or ideological objectives to harm or instill fear in any person or entity.

**Damages** means any of the following, incurred as a result of a **Claim**:

(A) amounts that an **Insured** is legally liable to pay to a **Third Party** in respect of judgments or arbitral awards rendered against an **Insured**;

(B) monies payable by an **Insured** to a **Third Party** pursuant to a settlement agreement negotiated by such **Insured** with the prior written approval of the **Insurer**; and

(C) punitive, exemplary or multiplied portion of multiple damages incurred by an **Insured**.

Enforceability of payment for punitive, exemplary and the multiplied portion of multiple damages will be governed by the applicable law that most favors coverage for such damages.

> **Damages** do not include:
>
> (1) future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured**;
>
> (2) loss, offset, restitution or return of fees, commissions, royalties, bonuses or profits of the **Insured**;
>
> (3) costs or expenses to comply with any order for, grant of or agreement to provide injunctive or other non-monetary relief;
>
> (4) taxes or loss of tax benefits;
>
> (5) **PCI Payments** or any contractual penalties, or liquidated damages, service credits or goodwill coupons but only to the extent that such penalties, damages, credits or coupons exceed the amount for which the **Insured** would have been liable in the absence of such agreement for penalties, damages, credits or coupons; or
>
> (6) **Fines and Penalties**.

**Data Breach Response Costs** means the reasonable and necessary costs for an **Expert** to:

(A) identify and preserve relevant electronic data on the **Company Computer System**;

(B) make notifications of such **Privacy Breach** to any data subject, **Third Party** or **Regulator** according to legal and regulatory duties;

(C) determine the extent of any relevant indemnification obligations contained in any written contract between the **Insured** and any **Third Party**;

(D) operate a call center for the benefit of affected data subjects;

(E) procure credit monitoring services for the affected data subjects; or

(F) procure identity monitoring and identity protection or restoration services or any similar service (including medical identity restoration for affected individuals) for the affected data subjects;

**Data Protection Legislation** means any law or regulation regulating the control or processing of personal data or information, including but not limited to the California Consumer Privacy Act, the New York SHIELD Act, the General Data Protection Regulation (Regulation EU 2016/679), or any similar

CY990001 0422



applicable law or regulation and including any regulations enacted in furtherance of or pursuant to their implementation.

**Data and System Recovery Costs** means reasonable and necessary costs for an **Expert** to (i) restore a **Company Computer System** to the same level of functionality which existed immediately prior to such **Cyber Event**; or (ii) restore, retrieve, repair or reinstall electronic data or software**.**

> **Data and System Recovery Costs** do not include any:

> (1) costs to comply with any order for, grant of or agreement to provide injunctive or other non-monetary relief;

> (2) legal costs and expenses of any type;

> (3) costs that the **Insured** would have incurred had the **Cyber Event** not occurred;

> (4) costs for the correction of incorrect manual input of electronic data;

> (5) costs to design, upgrade, maintain, or improve the **Company Computer System** or software to a level beyond that which existed prior to a **Cyber Event** unless such costs are less than or equal to the amount it would cost to design, upgrade, maintain, or improve the **Company Computer System** to the same or equivalent condition that existed immediately prior to such **Cyber Event**; or

> (6) internal costs or expenses of the **Insured** (including, but not limited to, labor costs and overhead); or

> (7) **Bricking Costs**.

**Defense Costs** mean reasonable and necessary fees, costs and expenses incurred by or on behalf of the **Insured** in relation to the investigation, defense, settlement of, or response to a **Claim** and appeal thereof. **Defense Costs** do not include any internal costs or expenses of the **Insured** (e.g. overhead, wages, salaries or other remuneration) or any **Cyber Event Costs**.

**Discovered** or **Discovery** means the time at which a member of **Management** first becomes aware of an event that triggers coverage under this Policy and the knowledge of such event would cause a person to reasonably believe that a **Loss** has been or is likely to be incurred, even if the exact amount or detail of the **Loss** may not be known at that time. All **Related Events** will be deemed to have been **Discovered** at the time the first such **Related Event** is **Discovered**.

**Employee** means any natural person employee (including part time, temporary, leased or seasonal employees), volunteer and intern, but only for work done while acting within the scope of employment.

**Expert** means any service provider relevant for the specific coverage under this Policy recommended or agreed by the **Insurer**, such agreement not to be unreasonably withheld or delayed.

**Extended Discovery Period** means the period of time stated in Item 4. of the Declarations and commencing immediately upon the expiration of the **Policy Period**.

**Extra Expense** means reasonable and necessary expenses incurred by the **Company** during the **Period of Restoration** to directly minimize, reduce or avoid **Loss of Profit**. **Extra Expense** does not include expenses the **Company** would have incurred had no **Business Interruption** occurred.

**Financial Institution** means a bank, credit union, or other licensed financial service or similar investment company at which the **Company** maintains a **Transfer Account**.

**Fines and Penalties** means all monetary, regulatory or administrative fines, penalties (other than criminal fines and penalties) and settlements that the **Insured** is legally liable to pay, to the extent these are insurable under the law that most favors coverage for such fines and penalties. **Fines and Penalties** does not include audit, assessment, compliance or reporting costs.

CY990001 0422



**Forensic Costs** means the reasonable and necessary costs for an **Expert** to analyze the **Company Computer System** to determine:

(A)    whether a **Cyber Event** has occurred;

(B)  the cause and extent of any **Cyber Event**; and

(C)  the method and means of mitigating a **Cyber Event**.

**Fraudulent Instruction** means the transfer, payment or delivery of **Money** or **Securities** by an **Insured** as a direct result of a fraudulent instruction provided by a **Third Party**, that is intended to mislead an **Insured** by misrepresenting material facts to such **Insured**.

> **Fraudulent Instruction** will not include loss arising out of:

(A)  fraudulent instructions received by the **Insured** which are not first authenticated via a method other than the original means of request to verify the authenticity or validity of the request;

(B)  any loss, transfer, payment or delivery of monies, securities or tangible property of a **Third Party** held in escrow by the **Company**;

(C)  any actual or alleged use of credit, debit, charge, access, convenience, customer identification or other cards;

(D)  the processing of, or the failure to process, credit, check, debit, personal identification number debit, electronic benefit transfers or mobile payments for merchant accounts;

(E)  accounting or arithmetical errors or omissions, or the failure, malfunction, inadequacy or illegitimacy of any product or service;

(F)  any indirect or consequential loss of any kind; or

(G)  any liability to any **Third Party**, or any legal costs or legal expenses.

**Funds Transfer Fraud** means the transfer, payment or delivery of **Money** or **Securities** by a **Financial Institution** as a direct result of a fraudulent instruction provided by a **Third Party** directing such institution to transfer, pay or deliver **Money** or **Securities** from a **Transfer Account** without the **Company's** knowledge or consent.

**Funds Transfer Fraud** will not include any loss arising out of any:

(A)  **Cyber Deception** covered by the **Company's** financial institution bond or commercial crime policy;

(B)  fraudulent, dishonest or criminal act or omission by, or involving, any **Insured Person**;

(C)  indirect or consequential loss of any kind;

(D)  punitive, exemplary or multiplied damages of any kind or any fines, penalties or loss of any tax benefit;

(E)  liability to any **Third Party** or any legal costs or legal expenses;

(F)  theft, disappearance, destruction of, unauthorized access to, or unauthorized use of confidential information, including authorization codes or security codes;

(G)  forged, altered or fraudulent negotiable instruments, securities, documents or instructions; or

(H)  use of payment cards or information contained on such cards.

CY990001 0422



**Insured** means the **Company** and the **Insured Persons**.

**Insured Person** means any:

(A)  member of **Management** acting within the scope and capacity of his or her job requirements;

(B)  **Employee**;

(C)  natural person contractor of the **Company,** but only while acting within the within the scope and capacity as such and in furtherance of the **Company's** business;

(D)  **Additional Insured**, but only as respects **Claims** against such person or entity for acts, errors or omissions of the **Company**; or

(E)  spouse, civil partner, estate, heir, executor, bankruptcy administrator, or legal representative of any natural person listed in (A) or (B) above, but solely for **Loss** arising from a covered **Claim** involving such natural person listed in (A) or (B) above.

**Insurer** means the entity as specified on the Declarations.

**Liability Claim** means a written demand for money or services, including without limitation the institution of a civil legal complaint, a demand for arbitration, or a written request to toll a statute of limitations. A **Liability Claim** does not include a **Regulatory Claim** or a **PCI Claim**.

**Legal and Regulatory Advice Costs** means the reasonable and necessary costs for an **Expert** to provide legal consultation or services to the **Insured**.

**Loss** means any **Business Interruption Loss**; **Cyber Event Costs**; **Damages**; **Data and System Recovery Costs**; **Defense Costs**; **Fines and Penalties**; **PCI Payments**; **PCI Investigation Costs**; **Ransom Payments**; **Reputation Loss**; **Supplier Interruption Loss**; and any other amounts covered under this Policy.

**Loss of Profit** means:

(A)  The net operating profit (before interest and tax) that the **Company** would have earned during the **Period of Restoration** had the **Business Interruption** not occurred; plus

(B)  the **Company's** usual and regular operating expenses to the extent that such operating expenses must continue during the **Period of Restoration**.

**Management** means any principal, chief executive officer, chief financial officer, general counsel, risk manager, chief information security officer, or the functional equivalents of any of the foregoing, of the **Policyholder**.

**Media Information** means any information, including words, sounds, numbers, images, video, and graphics displayed in any medium, but will not include computer software or the actual goods, products or services described or displayed therein.

**Media Wrongful Act** means any of the following acts committed by, or on behalf of, the **Company** in the course of creating, displaying, broadcasting, disseminating or releasing **Media Information** to the public:

(A)  defamation, libel, slander, product disparagement, trade libel, infliction of emotional distress or other tort related to disparagement or harm to the reputation or character of any person or entity;

(B)  a violation of the rights of privacy of an individual, including false light, intrusion upon seclusion and public disclosure of private facts;

(C)  invasion or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice or likeness;

CY990001 0422



(D) plagiarism, piracy, or misappropriation of ideas under implied contract;

(E) improper deep-linking or framing;

(F) false arrest, detention or imprisonment;

(G) invasion of or interference with any right to private occupancy, including trespass, wrongful entry or eviction;

(H) infringement of copyright;

(I) infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, or slogan, service mark or service name; or

(J) unfair competition, if alleged in conjunction with any infringement listed in parts (H) or (I) above.

**Merchant Services Agreement** means any written agreement between the **Company** and a financial institution, credit/debit card company, credit/debit card processor or independent services operator that sets out the terms and conditions relating to the **Company's** acceptance of payments or donations via payment card.

**Money** means:

(A) currency (other than digital currencies), coins, bank notes and any other medium of exchange in current use and authorized by a domestic or foreign government as a part of its currency; and

(B) traveler's checks, register checks, and money orders held for sale to the public.

**PCI Claim** means any written demand, suit or proceeding brought under a **Merchant Services Agreement**.

**PCI Investigation Costs** means:

(A) reasonable and necessary costs for a computer security **Expert** to demonstrate any **Company's** ability to comply with a **Merchant Services Agreement** and, in such **Company's** discretion, to provide advice and oversight in connection with an investigation conducted by a PCI forensic investigator; and

(B) reasonable and necessary costs for a PCI forensic investigator that is approved by the PCI Security Standards Council and retained by the **Company** in order to comply with the terms of a **Merchant Services Agreement** to investigate the existence and extent of an actual or suspected compromise of credit card data.

**PCI Payments** means sums of money assessed against the **Insured** as a penalty or fine pursuant to the terms of a **Merchant Service Agreement.**

**PCI Wrongful Act** means an actual or alleged breach of the **Insured's** obligations under the Payment Card Industry Data Security Standards (PCI-DSS) or similar payment industry standard.

**Period of Restoration** means the period listed in Item 7. of the Declarations that begins when the **Business Interruption** first occurs.

**Personally Identifiable Information** means any personal data controlled or processed by the **Insured** that is subject to protection by any **Data Protection Legislation**.

**Policyholder** means the entity listed in Item 1. of the Declarations.

**Policy Period** means the period of time listed in Item 2. of the Declarations.

**Privacy Breach** means any actual, alleged or suspected:

CY990001 0422



(A) loss, theft, or unauthorized or negligent disclosure, dissemination, disposal, or loss of operational control of any **Personally Identifiable Information** or **Confidential Information**;

(B) unauthorized access to or use of **Personally Identifiable Information** or **Confidential Information** in the **Company Computer System**; or

(C) violation of any **Data Protection Legislation**.

**Public Relations Costs** means the reasonable and necessary costs for an **Expert** incurred to prevent or reduce the effects of negative publicity that the **Insured** reasonably believes arises from an event triggering the coverage and covered under this Policy.

**Ransom Payment** means any:

(A) reasonable and necessary costs incurred for an **Expert** to evaluate and respond to a **Ransom Threat**; and

(B) monies (including digital currencies) paid by the **Company** in order to resolve or terminate a **Ransom Threat**;

provided that the **Company** takes reasonable steps to mitigate any **Ransom Threat**.

**Ransom Threat** means a credible threat or connected series of threats, made by someone other than a member of **Management**, to:

(A) execute any **Cyber Attack**; or

(B) disseminate, divulge, or improperly utilize any private information, **Personally Identifiable Information** or **Confidential Information** stored in the **Company Computer System**;

unless monies (including digital currencies) are received from or on behalf of the **Company**.

**Regulator** means any official or appropriate public authority while acting in its regulatory capacity to enforce **Data Protection Legislation** or any law or regulation regulating the safeguard of any **Computer System**.

**Regulatory Claim** means any:

(A) written request for information;

(B) written request to toll a statute of limitations;

(C) written civil investigative demand;

(D) institution of an investigation or audit; or

(E) institution of a civil proceeding;

by or on behalf a **Regulator**.

**Related Events** means any and all events triggering the specific coverage under this Policy arising out of, based upon, attributable to or in connection with related or repeated acts, omissions or events or the same originating cause or source. Multiple **Losses** arising from **Related Events** will be considered a single **Loss** for the purposes of this Policy.

**Reputation Event** means publication by someone other than an **Insured** of previously non-public information specifically concerning a **Cyber Event** or **Ransom Threat**.

CY990001 0422



**Reputation Loss**  means:

(A) The net operating profit (before interest and tax) that the **Company** would have earned during the **Reputation Period** had the **Reputation Event** not occurred; plus

(B) the **Company's** usual and regular operating expenses to the extent that such operating expenses must continue during the **Reputation Period**.

    **Reputation Loss** will not include any:

    (1) loss resulting from the decision of the **Company** to suspend, cancel or lapse of any lease, contract, license or orders;

    (2) liabilities to any **Third Party**;

    (3) legal expenses or costs;

    (4) consequential loss or loss incurred as a result of unfavorable business conditions;

    (5) **Data and System Recovery Costs**;

    (6) loss resulting from a complete or partial interruption or any slowdown of the operations of the **Company** for any period of time; or

    (7) **Ransom Payments**.

**Reputation Period** means the period beginning on the date the **Reputation Event** occurs, and ends after the earlier of:

(A)    180 days; or

(B)    the date that gross revenues are restored to the level they would have been but for the **Reputation Event**.

**Retention** means the applicable amount(s) listed in Item 7. of the Declarations.

**Rewards** means the reasonable amount paid by the **Company**, up to $50,000, to an informant for information not otherwise available that leads to the arrest and conviction of a person responsible for a **Cyber Event** (other than the informant).

**Securities** means negotiable or nonnegotiable instruments or contracts representing either **Money** or property.
**Securities** does not include **Money**.

**Subsidiary** means any entity that the **Company**, either directly or indirectly:

(A) controls the composition of the board of directors;

(B) holds more than 50% of the voting shares; or

(C) holds more than 50% of the issued share capital.

For any **Subsidiary** or any **Insured Person** thereof, cover under this Policy will only apply to an incident or event that occurs and is **Discovered**, while such entity is a **Subsidiary**.

**Supplier** means any **Third Party** that provides products or services to the **Company** pursuant to a written contract.



**Supplier Cyber Attack** means an intrusion into or unauthorized access or use of any **Computer System** operated by a **Supplier** or, any unauthorized modification, destruction, deletion, distribution or transmission or copying of, or rendering inaccessible, electronic data or software or consumption of computer resources of such **Computer System**, by any means, including, but not limited to, denial of service attacks.

**Supplier Failure** means any unintentional and unplanned interruption, other than an interruption caused by a **Cyber Attack**, of any **Computer System** operated solely by a **Supplier**.

**Supplier Interruption Event** means any **Supplier Cyber Attack** or **Supplier Failure**.

**Supplier Interruption Loss** means any **Loss of Profit** sustained by the **Company** and any **Extra Expense**.

> **Supplier Interruption Loss** will not include any:
>
> (A) loss resulting from the suspension, cancellation, or lapse of any lease, contract, license or orders;
>
> (B) liabilities to any third parties;
>
> (C) legal expenses or costs;
>
> (D) consequential loss;
>
> (E) **Data and System Recovery Costs**; or
>
> (F) **Business Interruption Loss**.

**Telephone Fraud** means toll and line charges incurred by an **Insured** solely as a result of a fraudulent infiltration and manipulation of a **Company**'s telephone system from a remote location to gain access to outbound long-distance telephone service.

**Third Party** means any natural or legal person except any **Insured**.

**Transfer Account** means an account maintained by the **Company** at a **Financial Institution** from which the **Company** can initiate the transfer, payment or delivery of **Money** or **Securities** to a **Third Party**.

**Unplanned Failure** means any unintentional and unplanned interruption of a **Company Computer System**, other than an interruption caused by a **Cyber Attack.**

**Voluntary Notification Costs** means the reasonable and necessary costs incurred by the **Insured** to make voluntary notifications of any actual, alleged or suspected **Privacy Breach** to any data subject, **Third Party,** or **Regulator**, provided the **Insured** reasonably believes such voluntary notification will mitigate other **Loss** covered under this Policy.

**Waiting Period** means the period as specified in Item 7. of the Declarations, starting at the beginning of the **Business Interruption**.

### EXCLUSIONS

No coverage is available under this Policy with respect to any **Loss**, or any other amounts arising out of:

**Bodily Injury**

any actual or alleged physical injury, sickness, disease or death of any natural person, including any mental anguish or emotional distress resulting from such physical injury, sickness, disease or death.

CY990001 0422



### Property Damage

any actual or alleged damage to or destruction of any tangible property, including loss of use thereof; provided that this exclusion will not apply to **Data and System Recovery Costs** or **Bricking Costs**. Electronic data and software are not considered tangible property for purposes of this exclusion.

### Company Claims

any **Claim** brought by, on behalf of, or at the instigation of the **Company** or member of **Management**.

### Dishonest or Improper Conduct

any deliberately criminal, fraudulent, dishonest, or malicious act or omission by any member of **Management**. However, the **Insurer** will advance **Defense Costs** unless and until there is a final non-appealable decision of a court, arbitration tribunal or **Regulator** in the underlying proceeding establishing such deliberately criminal, fraudulent, dishonest, or malicious act or omission, at which time the **Policyholder** will promptly repay to the **Insurer** any amount paid to or on behalf of such member of **Management** under this **Policy**.

For the purposes of this exclusion, no conduct, act or omission of one **Insured** will be imputed to any other natural person **Insured** and only the knowledge possessed by, and any conduct, act or omission of, any past or present member of **Management** will be imputed to the **Company**.

### Legislative

any actual, alleged or suspected violations of:

(A)     the Employment Retirement Income Securities Act of 1974;

(B)     the Racketeer Influenced and Corrupt Organization Act of 1961;

(C)     the False Claims Act (31 U.S.C. §§ 3729-3733); or

(D)     statutes, ordinances, regulations or laws regarding or relating to unsolicited marketing activities, including but not limited to Telephone Consumer Protection Act of 1991 (TCPA) and Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act);

(E)     the Americans with Disabilities Act of 1990 (ADA); or

(F)     the Fair Credit Reporting Act (FCRA);

(G)     statutes, ordinances, regulations or laws regarding or relating to antitrust violations, restraint of trade, price fixing, or unfair competition (except as provided in the Media Liability insuring agreement), including but not limited to the Sherman Antitrust Act, the Clayton Act, the Robinson-Patman Act;

and including (i) any rules or regulations promulgated thereunder, and (ii) any similar statutes, ordinances or regulations.

### Pollution

or in any way involving any discharge, dispersal, seepage, migration, release or escape of any:

(A)     solid, liquid, gaseous, biological, radiological or thermal irritant, hazardous substance or contaminant, including but not limited to  asbestos or asbestos products, smoke, fibers, mold, spores, fungi, germs, vapor, dust, soot, fumes, acids, alkalis, chemicals, radiation and waste. Waste includes but is not limited to materials to be recycled, reconditioned or reclaimed, and nuclear materials;



(B) electromagnetism, or electromagnetic energy, radiation, or fields or force; or nuclear or other radiation.

### Prior Claims and Knowledge

any fact, event, or circumstance, likely to give rise to a **Claim** or **Loss** of which a member of **Management** was aware (including claims, incidents or circumstances noticed under other insurance), or after reasonable inquiry should have been aware, prior to the **Continuity Date**.

### Trade Secrets and Intellectual Property

any actual or alleged theft, misappropriation, plagiarism, misuse, or infringement of any rights with respect to patents, patent licenses, or the registration of patents.

### Government Actions

a **Claim** brought by or on behalf of any state, federal, local or foreign governmental entity, in such entity's regulatory or official capacity; but this exclusion will not apply to the Regulatory Fines & Penalties insuring agreement.

### Trading

any actual or alleged trading losses, trading liabilities or change in value of accounts; any loss, transfer or theft of monies, securities or tangible property of the **Insured** or others; or the monetary value of any transactions or electronic fund transfers by or on behalf of the **Insured** which is lost, diminished, or damaged during transfer from, into or between accounts; provided, however, that this exclusion will not apply to coverage provided under the Cyber Deception insuring agreement.

### Sale or Ownership of Securities

(A) the ownership, sale, or the offer to sell or purchase stock or **Securities**; or

(B) an actual or alleged violation of a securities law or regulation.

### Discrimination and Employment

any actual or alleged discrimination or any refusal to employ any person, or any employer-employee relations, policies, practices, acts or omissions, or misconduct with respect to **Employees**.

### War, Looting and Governmental Acts

any war, invasion, act of foreign enemy, hostile operations (whether war has been declared or not), civil war, rebellion, revolution, insurrection, riot or civil commotion assuming the proportion of or amounting to a popular uprising, military or usurped power or martial law, looting; provided, however this exclusion will not apply to **Cyber Terrorism**.

### Confiscation

any expropriation, nationalization, confiscation, requisition or seizure of property or data by order of any governmental or public authority.

### Natural Perils and Physical Events

any fire, smoke, explosion, lightning, wind, flood, earthquake, windstorm, volcanic eruption, tidal wave, landslide, hail, act of God, or other physical event, however caused.

### Failure of Infrastructure

any failure or malfunction of satellites or of power, utility, mechanical or telecommunications infrastructure or services that are not under the **Company's** direct operational control.

CY990001 0422



**Improvement of Company Computer System**

(A) any costs or expenses that the **Insured** incurs to identify or remediate software program errors or vulnerabilities;

(B) costs to establish, implement, maintain, improve or remediate security or privacy practices, procedures, programs or policies; or

(C) any costs to update, replace, restore, assemble, reproduce, recollect or enhance data or a **Company Computer System** to a level beyond that which existed prior to a **Cyber Event**, **Business Interruption Event**, **Supplier Interruption Event** or **Ransom Threat**; provided that this exclusion will not apply where such costs are less than or equal to the amount it would cost to update, replace, restore, assemble, reproduce, recollect or enhance data or **Company Computer Systems** to the same or equivalent condition that existed immediately prior to a **Cyber Attack** under the Data and Systems Recovery insuring agreement.

### EXCLUSIONS APPLICABLE TO MEDIA

Solely with respect to the Media Liability insuring agreement, no coverage will be available under this Policy with respect to any **Loss**, or any other amounts arising out of:

**Contractual Liability**

Any contractual liability; provided that this exclusion will not apply to a **Claim** for misappropriation of ideas under implied contract.

**Recall**

any costs or expenses incurred or to be incurred by the **Insured** or others for the reprinting, reposting, recall, removal or disposal of any **Media Information** or any other content, media or information or products.

**Licensing**

any (i) actual or alleged licensing fee or royalty payment including, but not limited to, any obligation to pay such fees or royalty payments; or (ii) **Claim** brought by or on behalf of any intellectual property licensing bodies or organizations.

**Description of Goods and Services**

the actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services, cost guarantees, cost representations, price estimates, or the failure of any goods or services to conform with any represented quality or performance.

**Promotions**

any actual or alleged promotional game, lottery or other game of chance; or the value of discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients.

**Joint Ownership Disputes**

disputes regarding ownership of rights in **Media Information** or services provided by an independent contractor or venture partner.

CY990001 0422



## DUTIES OF THE INSURED AND OTHER CONDITIONS

### Notification

(A)     Upon **Discovery** of an incident giving rise to Coverage For The Insured's Direct Loss, the **Insured** will give written notice thereof to the **Insurer** as soon as reasonably practicable, but in any event not later than 60 days after the end of the **Policy Period**.

(B)     With regard to a **Claim** giving rise to Coverage For Claims Made Against The Insured, the **Insured** will give written notice thereof to the **Insurer** as soon as reasonably practicable after a member of **Management** first becomes aware of such **Claim**, but in no event will the **Insured** give notice of a **Claim** later than (i) 60 days after the end of the **Policy Period**, or (ii) the **Extended Discovery Period** (if applicable).

(C)     If the **Insured** becomes aware of any circumstance that is reasonably likely to give rise to a **Claim**, the **Insured** may give written notice thereof to the **Insurer** during the **Policy Period**.

The notification of the circumstances must be made in writing during the **Policy Period** and must include:

(1)     the reasons for expecting such circumstances to give rise to a **Claim**, including full particulars as to the nature and date of the actual or alleged **Cyber Event**, **PCI Wrongful Act**, or **Media Wrongful Act**;

(2)     the date and manner by which the **Insured** first became aware of such circumstances; and

(3)     the identity of any potential **Insureds** and claimants.

All notifications and all communications under this Policy must be in writing to the address listed in Item 6. of the Declarations.

If during the **Policy Period** the **Insured** provides notice of a circumstance in accordance with the requirements of (C) above, then any future **Claim** arising out of such notified circumstance will be deemed made at the time the **Insurer** first received notice of the circumstance.

### Defense

The **Insurer** has the right and duty to defend any **Claim** made against any **Insured**.  Defense counsel will be mutually agreed by the **Insured** and the **Insurer** but, in the absence of such agreement, the **Insurer's** decision will be final.

The **Insurer** will pay actual loss of salary and reasonable expenses resulting from the attendance by an **Insured** at any mediation meetings, arbitration proceedings, hearings, depositions, or trials relating to the defense of any **Claim**, subject to a maximum of $500 per day and $5,000 in the aggregate, which amounts will be part of and not in addition to the **Aggregate Limit of Liability**.

### Consent

The **Insured** must obtain the **Insurer's** written consent (such consent not to be unreasonably withheld or delayed) prior to:

(A)     settling any **Claim** or otherwise assuming any contractual obligation, voluntarily making any payment, or admitting liability with regard to any **Claim**; or

(B)     incurring any **Ransom Payment**, **Cyber Event Costs**, **Data and System Recovery Costs** or **Defense Costs** unless it is not reasonably possible to obtain the prior consent of the **Insurer**, in which case the **Insured** may incur reasonable and necessary **Ransom Payment**, **Cyber Event Costs**, **Data and System Recovery Costs** or **Defense Costs**.

CY990001 0422



### Cooperation

The **Insured** will take all reasonable steps to reduce or minimize **Loss** and will provide to the **Insurer** all such information, cooperation and assistance as reasonably required. Upon request by the **Insurer**, the **Insured** will also submit to the **Insurer** a written proof of **Loss** explaining in reasonable detail the circumstances and calculation of such **Loss**.

### Subrogation and Recoveries

The **Insurer** will be subrogated to all of the **Insured's** available rights of recovery for all payments made by the **Insurer** under this Policy. The **Company** and all **Insureds** will do everything necessary to secure any such recovery rights for the **Insurer**, including the execution of any documents necessary to enable the **Insurer** effectively to bring a recovery action or suit in the name of the **Insurer**, **Company** or **Insured** (as applicable), whether such acts become necessary before or after payment by the **Insurer**.

If an **Insured** has waived its right to subrogate against a **Third Party** through written agreement made before an incident or event giving rise to a **Claim** or **Loss** has occurred, then the **Insurer** waives its rights to subrogation against such **Third Party**. Any recovery received will first be applied against any payment made by the **Insurer** with any balance remaining thereafter being remitted to or retained by the **Company** or **Insured**. Recovery by the **Insurer** from reinsurance will not be deemed a recovery hereunder.

### Settlement of Claims

If the **Insured** refuses to consent to settle a **Claim** as recommended by the **Insurer**, the **Insurer**'s liability for such **Claim** will not exceed:

(A)     the amount of **Defense Costs** incurred prior to the date of such recommendation; plus

(B)     60% of all future **Defense Costs** incurred after the date such settlement or compromise was recommended to the **Insured** plus 60% of any **Damages** above the amount for which the **Claim** could have been resolved.

### LIMIT OF LIABILITY AND RETENTION

### Limit of Liability

The **Insurer's** liability to pay or indemnify under this Policy for each and every **Loss** and for all **Loss** in the aggregate will not exceed the **Aggregate Limit of Liability**.  Any amounts paid by the **Insurer** under this Policy will erode the **Aggregate Limit of Liability**.

Each limit of coverage specified in the Declarations or elsewhere in this Policy is the maximum amount the **Insurer** will pay for the coverage to which it applies and is part of, and not in addition to, the **Aggregate Limit of Liability**.

### Retention

Coverage under this Policy will apply only after the **Insured** has paid the applicable **Retention**. In the event of a **Loss**, the **Insurer** will be responsible only for the amount of **Loss** that is in excess of the applicable **Retention**.

Coverage for **Business Interruption Loss** and **Supplier Interruption Loss** will apply after the **Waiting Period** has elapsed and the **Insurer** will then indemnify the **Company** for all **Business Interruption Loss** and **Supplier Interruption Loss** sustained during the **Period of Restoration** in excess of the **Retention**.

If more than one **Retention** applies to a **Related Event**, the **Insured** is responsible to pay an amount equal to the largest of such applicable **Retention** amounts.

CY990001 0422



## GENERAL PROVISIONS

### Extended Discovery Period

In the event of cancellation or non-renewal of this Policy, by either the **Company** or **Insurer** (for reasons other than for non-payment of the premium), the **Company** will be entitled to purchase an **Extended Discovery Period** by making a request in writing not later than 60 days after expiration of the **Policy Period** and paying the additional premium listed in Item 4. of the Declarations for such **Extended Discovery Period**. The purchase of the **Extended Discovery Period** will in no way increase the **Aggregate Limit of Liability**. Such additional premium will be deemed fully earned and not eligible for refund or repayment. The **Extended Discovery Period** will provide for extended coverage under this **Policy** only for **Claims** (i) first made against an **Insured** during the **Extended Discovery Period**, and (ii) arising out of a **Cyber Event** or **Media Wrongful Act** occurring before the end of the **Policy Period**.

### New Subsidiaries

If during the **Policy Period** any **Company** creates or acquires a new entity it will automatically be covered under this **Policy** as a **Subsidiary**, provided that such entity does not have an annual revenue exceeding fifteen percent (15%) of the consolidated net annual revenue of the **Policyholder** as of the beginning of the **Policy Period**.

### Change in Control

If during the **Policy Period** an **Acquisition** occurs, the **Insurer** will only be liable to make a payment under this **Policy** in relation to any **Loss** or **Claim** based upon or attributable to any incident or event that occurred prior to the date upon which the **Acquisition** is legally effective in the jurisdiction in which it occurs.

The **Company** will give the **Insurer** written notice of the **Acquisition** as soon as practicable after the **Company** first becomes aware of the **Acquisition**.

**Acquisition** means any of the following:

(A)     the **Company's** merger with, or consolidation into, any other entity;

(B)     the sale of all or the majority of the **Company's** assets to any person or entity acting alone or in concert; or

(C)     any person or entity acting alone or in concert acquiring ownership or control or assuming control pursuant to written agreement with other shareholders or similar security holders of more than 50% of the outstanding securities representing the present right to vote for the election of the board of directors of the **Company** or assuming the right to appoint or remove the majority of the board of directors (or equivalent position) of the **Company**.

### Bankruptcy

If a receiver, liquidator, administrator or equivalent under the laws of any jurisdiction is appointed to any **Insured** during the **Policy Period**, the **Insurer** will only be liable to make any payment under this Policy in relation to any **Loss** or **Claim** based upon or attributable to any incident or event that occurred prior to the effective date of such appointment.

### Policy Administration

Unless expressly stated otherwise in this Policy, the **Policyholder** will act on behalf of itself and each and every **Insured** with respect to all matters relevant to this **Policy**. The payment of any **Loss** and or any other amounts payable under this Policy to the **Company** will fully release the **Insurer** with respect to such **Loss** and all other amounts.

CY990001 0422



**Premium Payment and Termination**

(A)     The **Policyholder** may cancel this Policy by mailing to the **Insurer** advance written notice of cancellation.

(B)     The **Insurer** may cancel this Policy by mailing to the **Policyholder** written notice stating when such cancellation will be effective. Such date of cancellation will not be less than 60 days (or 10 days for cancellation due to non-payment of premium) after the date of notice.

(C)     If this Policy is cancelled in accordance with (A) or (B) above, the earned premium will be computed pro rata; but the premium will be deemed fully earned if any **Claim**, or any circumstance that could be the basis of a **Claim** or **Loss**, is reported to the **Insurer** on or before the date of cancellation. Payment or tender of unearned premium is not a condition of cancellation.

**Other Insurance / Indemnification**

Coverage under this Policy is provided only as excess over any other more specific valid and collectible insurance, including any self-insured retention or deductible thereof unless such other insurance is written only as specific excess insurance over this Policy and the **Aggregate Limit of Liability**.

**Interpretation**

The descriptions in the headings and titles of this Policy are solely for reference and convenience and do not lend any meaning to this Policy.

**Rights of Third Parties**

Unless otherwise mandated by law, this Policy does not confer a directly enforceable benefit or right to enforce any term of this contract upon any **Third Party**.

**Assignment**

The **Insured** will not be entitled to assign this Policy nor any interest or right under the Policy without the **Insurer's** written consent.

**Sanctions/Embargoes**

The **Insurer** will not be deemed to provide cover and the **Insurer** will not be liable to pay any **Loss** or provide any benefit hereunder to the extent that the provision of such cover, payment of such **Loss** or provision of such benefit would expose the **Insurer** to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the United States.

**Territory**

Coverage under this **Policy** applies anywhere in the world unless such coverage is not legally permitted.

CY990001 0422

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF "YOUR" POLICY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM and DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| |
|---|
| **Terrorism Premium (Certified Acts)** $ 0 |
| **This premium is the total Certified Acts premium attributable to this Policy.** |
| **Federal share of terrorism losses [enter percentage]** 80 **% Year: 20**25 <br> (Refer to Paragraph B. in this endorsement.) <br> **Federal share of terrorism losses [enter percentage]** 80 **% Year: 20**26 <br> (Refer to Paragraph B. in this endorsement.) |

A. Disclosure Of Premium

In accordance with the federal Terrorism Risk Insurance Act, "we" are required to provide "you" with a notice disclosing the portion of "your" premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of "your" premium attributable to such coverage is shown in the Schedule of this endorsement.

B. Disclosure Of Federal Participation In Payment Of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

C. Cap On Insurer Participation In Payment Of Terrorism Losses

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, "we" shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

D. "Certified Act of Terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the Act, to be an act of terrorism pursuant to such act. The criteria contained in the Act for a "Certified Act of Terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

E. For the purpose of this endorsement the following definitions are added:

1. the term "we" and "our" refers to the Insurance Company providing coverage.

2. the term "you" and "your" refers to the insured entity named in the Declarations Page.

F. The inapplicability or omission of a terrorism exclusion, does not serve to create coverage for any "loss" (as defined in the applicable coverage) that is otherwise excluded under the coverage specified above."

# NUCLEAR ENERGY LIABILITY EXCLUSION
## (Broad Form)

This endorsement modifies insurance provided under the following:

AMTRUST CYBER LIABILITY POLICY

The following exclusion is added:

No coverage is available under this Policy with respect to any **Loss**, or any other amounts arising out of:

### Nuclear Energy

(A) liability:

    (1) With respect to which an **Insured** under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (2) Resulting from the **hazardous properties** of **nuclear material** and with respect to which

        (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or

        (b) the **Insured** is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

(B) liability resulting from **hazardous properties** of **nuclear material**, if:

    (1) the **nuclear material**

        (a) is at any **nuclear facility** owned by, or operated by or on behalf of, an **Insured** or

        (b) has been discharged or dispersed therefrom;

    (2) the **nuclear material** is contained in **spent fuel** or **waste** at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an **Insured**; or

    (3) the liability arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility**, but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to **property damage** to such **nuclear facility** and any property thereat.

As used in this endorsement:

**Hazardous properties** includes radioactive, toxic or explosive properties.

**Nuclear material** means **source material**, **special nuclear material** or **by-product material**.

**Source material**, **special nuclear material** and **by-product material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**Spent fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **nuclear reactor**.

**Waste** means any waste material

    (1) containing **by-product material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **source material** content, and

    (2) resulting from the operation by any person or organization of any **nuclear facility** included under the first two paragraphs of the definition of **nuclear facility**.

**Nuclear facility** means:

    (1) Any **nuclear reactor**;

    (2) Any equipment or device designed or used for

        (a) separating the isotopes of uranium or plutonium,

        (b) processing or utilizing **spent fuel** or

        (c) handling, processing or packaging **waste**;

    (3) Any equipment or device used for the processing, fabricating or alloying of **special nuclear material** if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    (4) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of **waste**;

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**Nuclear reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**Property damage** includes all forms of radioactive contamination of property.

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# MICHIGAN AMENDATORY ENDORSEMENT

In consideration of the premium paid for this Policy, it is hereby understood and agreed that:

1.  **Notification** under **DUTIES OF THE INSURED AND OTHER CONDITIONS** is amended to include:

    Notice given by or on behalf of the **Insured** to the **Insurer's** authorized agent, with particulars sufficient to identify the **Insured** shall be considered notice to the **Insurer**. Failure to give any notice required within the time period specified shall not invalidate any **Claim** made by the **Insured** if it shall be shown not to have been reasonably possible to give notice within the prescribed time period and that notice was given as soon as was reasonably possible.

2.  Paragraphs (B) and (C) of **Premium Payment and Termination** under **GENERAL PROVISIONS** is deleted in its entirety and replaced with the following:

    (B)     The **Insurer** may cancel this Policy by mailing to the **Policyholder** written notice stating when such cancellation shall become effective and the reason(s) therefore.  The **Insurer** shall provide not less than 10 days' written notice.

    (C)     Neither the **Policyholder** nor the **Insurer** have any obligation to renew this Policy. Any renewal will be on the forms and endorsements then in effect. If the **Insurer** elects not to renew this Policy, or coverage of any **Insured**, or intend to offer renewal with reduced coverage or an increase in premium for other than an increase in coverage or exposure unit, the **Insurer** will mail to the **Policyholder** written notice of such nonrenewal at least 60 days before the end of the **Policy Period**. The notice for nonrenewal shall state the reason for nonrenewal.

    The **Insurer** will send written notice of cancellation, nonrenewal or renewal with reduced coverage by certificate of mail or by commercial mail delivery service to the **Policyholder** at the last known mailing address and to their agent or broker.

    (D)     If this Policy is cancelled pursuant to paragraph (A), the Insurer will refund the excess of paid premium or assessment above the pro rata rates for the expired time. If this Policy is cancelled pursuant to paragraph (B), the Insurer shall retain the pro rata portion of the premium. The minimum earned premium shall not be less than the pro rata premium for the expired time or $25.00, whichever is greater. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation.

3.  Bankruptcy or insolvency of any **Insured** will not release the **Insurer** of any obligations hereunder.

Nothing herein contained will be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of this Policy other than as stated above.