**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**NEWNAN DIVISION**

| | |
|---|---|
| **BASKLOOFS STONE, INC. d/b/a** ) | |
| **DEBEER GRANITE & MARBLE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | |
| ) | **3:25-cv-00256-LMM** |
| **TRUIST BANK, INC., and** ) | |
| **TECHNOLOGY INSURANCE** ) | |
| **COMPANY d/b/a AMTRUSTCYBER,** ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFF'S SUR-REPLY IN OPPOSITION TO TRUIST BANK'S**
**MOTION TO COMPEL ARBITRATION AND TO DISMISS OR STAY**

In its Reply in Support of Its Motion to Compel Arbitration and to Dismiss or Stay, [Doc. 13], Defendant Truist Bank, Inc. ("Truist") introduced new evidence for the first time to suggest that Plaintiff Baskloofs Stone, Inc. d/b/a De Beer Granite & Marble ("de Beer") accepted the 2025 version of the Commercial Bank Services Agreement (the, "CBSA"). With an Order issued on April 27, 2026, [Doc. 27], this Court directed Plaintiff de Beer to file a sur-reply, limited to address this issue.  De Beer now timely responds as follows:

**DISCUSSION**

The evidence introduced by Truist falls short of demonstrating acceptance of the 2025 CBSA, for at least three reasons.  The first is that de Beer's continuing to

use its account was not an unequivocal expression of assent because de Beer was contractually bound to maintain the account. Under the terms of a loan that de Beer utilized from Truist, de Beer was obligated to maintain a deposit relationship with Truist, from which Truist could debit payments due under the loan. Closing the account was therefore not a true option for de Beer, as a result of contractual requirements imposed by Truist itself. Second, even if de Beer's continued use could be read as an acceptance, the acceptance that was invited by Truist was not of the entire contract, but only "*of our changes.*" The arbitration agreement upon which Truist relies was part of the 2023 version of the CBSA, and was not part of "our changes" which it tendered up for de Beer to accept. And third, the suggestion that the entire 2025 CBSA was proposed and accepted through notice and continued use of the account is not tenable, because federal courts have found that such a proposition would be unreasonable and contrary to good faith and fair dealing. As a result, Truist still cannot show a properly enacted arbitration agreement between de Beer and Truist, and the motion to compel arbitration must therefore be denied.

## A.    *Relevant Facts*

According to the affidavit of Sharon Griffies, which is submitted as Attachment A to this Motion ("Griffies Aff."), Truist has extended at least two SBA 504 loans to De Beer. *See generally the Griffies Aff.* Truist drafted and

issued Loan Commitment Letters in connection with these loans in or about September 2023, *id.* at ¶ 4, in which it required that de Beer agree "to maintain a deposit relationship with [Truist] and execute an agreement authorizing [Truist] to automatically debit all payments due." *Id*. at ¶ 8. Truist also required de Beer to sign Drafting Authorizations permitting Truist to "withdraw funds for the repayment of its SBA Loan from the account number which is the subject of this action, Account ***0274." *Id.* at ¶ 9.

### B.    *De Beer's Continued Use of the Account Was Not An Unequivocal Acceptance of Truist's Proposed Changes.*

De Beer's having continued to use the account ending in *0274 (the "Account") did not constitute acceptance of the changed terms proposed by Truist. Under Georgia law, "[i]n determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable person in the position of the other contracting party would ascribe to the first party's manifestations of assent." *Groves v. Gibbs*, 367 Ga. App. 730, 733 (2023). Here, a reasonable person in the position of Truist would have realized that de Beer's maintenance of its accounts in the face of its notice could be ascribed just as much to a desire to respect its outstanding contractual obligations as to a desire to manifest assent to the proposed changes. This is because Truist required de Beer to

maintain a deposit relationship with it had de Beer authorize Truist to automatically debit all payments due from its accounts.

Under Georgia law, "to constitute a contract, an offer must be accepted *unequivocally* and without variance of any sort." *Greenberry Indus., LLC v. ESI, Inc. of Tennessee*, 2022 WL 17584421, at *4 (N.D. Ga. Dec. 12, 2022) (citing *Bennett v. Novas*, 364 Ga. App. 364, 366 (2022) (emphasis in original). In this case, any conduct from de Beer that could be interpreted as acceptance was at best equivocal, with an equally plausible motivation that does not signal acceptance of proposed terms, and therefore it would not have cleared the bar set for acceptance of contract by conduct. As a result, de Beer cannot be said to have agreed to the changed terms proposed by Truist.

## C.   *In Its Notice Truist Only Invited Acceptance of Incidental Amendments To, And Not Operative Part Of, Arbitration Agreement.*

Even if de Beer's continued maintenance of the Account after the deadline imposed by Truist's notice can be thought to constitute acceptance, it is important to understand exactly what it is that de Beer would have accepted. By the very terms of the offer, Truist proposed that "[c]ontinued use of your account after the effective date constitutes your acceptance *of the changes*." [Doc. 16.1], p. 9 (emphasis added). As offeror, Truist was the master of the offer, and chose to put up for approval only the incremental changes, not the entire contract. The

arbitration agreement proper was in the 2023 version of the CBSA, *compare* [Doc. 13.1] at 15-19 (arbitration agreement in 2023 CBSA) *with id.* at 54-59 (same in 2025 CBSA), and as a result Truist did not seek de Beer's acceptance of the bulk of the arbitration agreement.

To be sure, the parts that *were* offered for acceptance did not constitute an enforceable contract.  "OCGA §§ 13–3–1 and 13–3–2 provide that a contract is not complete and enforceable until there is a meeting of the minds as to all essential terms. . . . Each of these essential terms must be certain.  The requirement of certainty extends not only to the subject matter and purpose of the contract, but also to the parties, consideration, and even the time and place of performance." *Drake v. Wallace*, 259 Ga. App. 111, 112 (2003).  Here, the parts that constituted changes from the 2023 to the 2025 versions of the CBSA were mere ancillary details compared to the body of the arbitration agreement, and did not have the requisite elements to constitute an enforceable agreement.  As a result, even if it were assumed that an offer and acceptance did take place, such an exchange would not have enacted a sufficiently complete, enforceable agreement.

**D.    *The Notice Cannot Have Lawfully Ratified the Entire 2025 CBSA Through Silent Agreement.***

Neither is the suggestion in the notice that "[a]ll future transactions on your account will be governed by the amended CBSA," [Doc. 16-1] at 9, sufficient to

establish a valid arbitration agreement.  Multiple federal courts have held that previously agreed terms may not be modified through an unreasonably large amendment containing an arbitration agreement, be sprung upon unsuspecting subscribers, and proposed to be accepted through silence.  For example, in *Sevier Cnty. Schs. Fed. Credit Union v. Branch Banking & Tr. Co.*, 990 F.3d 470 (6th Cir. 2021), the Sixth Circuit applied Tennessee law to find that 33 pages of new terms, including an arbitration agreement, being proposed in a notice sent to account holders, with notice that continued use of account would be deemed as acceptance, was unreasonable and incompatible with covenant of good faith and fair dealing. In reaching this result, the Sixth Circuit focused on the fact that account holders did not have a "meaningful opportunity" to reject changes because doing so would have meant forgoing advantageous account terms.  *Id.* at 480.  To apply that principle in this case, if the entire CBSA were being proposed as a whole, and assent was being solicited by silent maintenance of a bank account, that change would be neither reasonable nor accordant with good faith and fair dealing.  As a result, no argument can be made either that Truist proposed, or that de Beer accepted, the *entire* 2025 CBSA by way of the remark in the notice that all future transactions would be governed by the amended CBSA.

## **CONCLUSION**

For the foregoing results, Truist's Motion to Compel Arbitration and to Dismiss or Stay should be denied, and this Court should retain jurisdiction over this dispute.

Respectfully submitted, this 7th day of May, 2026.

FGP LAW, LLC

/s/ Frank G. Podesta
Frank G. Podesta
Georgia Bar No. 496530
fpodesta@fgplaw.com

555 Sun Valley Drive
Suite N-3
Roswell, Georgia 30076
678.677.5143 (voice)
678.222.0123 (facsimile)
*Attorneys for de Beer*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing **Sur-Reply Brief** was prepared using 14 Point Times New Roman Font, and that on May 7, 2026, I filed and served the foregoing with the Clerk of Court and upon all counsel of record via this Court's CM/ECF Electronic Case Filing System.

Respectfully submitted, this 7th day of May, 2026.

FGP LAW, LLC


/s/ Frank G. Podesta
Frank G. Podesta
Georgia Bar No. 496530

# Attachment A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

| | | |
|---|---|---|
| **BASKLOOFS STONE, INC. d/b/a** | ) | |
| **DEBEER GRANITE & MARBLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | |
| | ) | **3:25-cv-00256-LMM** |
| **TRUIST BANK, INC., and** | ) | |
| **TECHNOLOGY INSURANCE** | ) | |
| **COMPANY d/b/a AMTRUSTCYBER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**AFFIDAVIT OF SHARON GRIFFIES**

| | |
|---|---|
| **STATE OF GEORGIA** | ) |
| | ) |
| **COUNTY OF COWETA** | ) |

I, Sharon Griffies, pursuant to the penalties of perjury, affirm that the following is true and correct:

1.    I, Sharon Griffies, am over the age of eighteen and am otherwise competent to give testimony regarding the matters stated in this Affidavit based on my personal knowledge.

2.    I am the controller of Baskloofs Stone, Inc. d/b/a deBeer Granite & Marble ("Baskloofs"), which is the Plaintiff in this matter.

1

3. I am personally familiar with each of the documents attached as Exhibits to this Affidavit.

4. On or about September 25, 2023, Truist issued a Small Business Administration ("SBA") Loan Commitment Letter, drafted entirely by Truist, to Baskloofs relating to an SBA Loan for Baskloofs held by Truist (the, "Loan Commitment"). A true and correct copy of the Loan Commitment is attached hereto as Exhibit A.

5. On or about December 15, 2023, Truist required Baskloofs to provide a Draft Authorization for Loan Closing Fees and Loan Payments and Fees, created entirely by Truist, in favor of Truist as part of the SBA Loans and relating to the Loan Commitment (the, "Drafting Authorization"). A true and correct copy of the Drafting Authorization is attached hereto as Exhibit B.

6. On or about December 15, 2023, Truist required Baskloofs to provide a Security Agreement, drafted entirely by Truist, in favor of Truist as part of the SBA Loans and relating to the Loan Commitment (the, "Security Agreement"). A true and correct copy of the Security Agreement is attached hereto as Exhibit C.

7. Each of these documents were part of the overall Truist SBA Loan to Baskloofs.

2

8.      On Page 4 of the Loan Commitment, under the header "Payments by Auto-Debit," Truist required that Baskloofs agree "to maintain a deposit relationship with [Truist] and execute an agreement authorizing [Truist] to automatically debit all payments due." *See* Exh. A, p. 4.

9.      The Drafting Agreement is the agreement required as per Paragraph 8 of this Affidavit, on Page 4 of the Loan Commitment, wherein Baskloofs (maintaining a deposit account, as required by Truist), authorized Truist to withdraw funds for the repayment of its SBA Loan from the account number which is the subject of this action, Account ***0274, and which is referenced in Exhibits E, F and G of Truist Reply in Support of its Motion to Compel Arbitration [Doc. 16-1]. *See* Exh. B.

10.     The Security Agreement provided Truist with a "security interest in all accounts now owned … by [Baskloofs], and all the proceeds … thereof." *See* Exh. C, Sect. 3.d, P. 2.

11.     The Security Agreement further provided Truist a right of setoff against these accounts. *See* Exh. C, Sect. 12, p. 5.

12.     These requirements within the Security Agreement were part of the greater SBA Loan between Truist and Baskloofs, and were affirmatively required by Truist.

3

13.    I declare under the penalty of perjury that the foregoing is true and correct.

Further, affiant sayeth naught.

This 7th day of May, 2026.

<span style="text-align:right">Sharon Griffies</span>

Sworn to and subscribed before me this
7th Day of May, 2026.

Notary Public
My commission expires: _____

4

# Exhibit

# A



August 29, 2023                                                    revised 9/25/23

Baskloofs Stone Inc.
145 Mallory Court
Tyrone, GA  30290

Attention:  Guarantors name here

Re: SBA 504 Loan Commitment Letter

Truist Bank (the "*Bank*") is pleased to confirm that the Bank has approved your request for an SBA 504 loan subject to the following terms and conditions set forth in this letter (the "*Commitment Letter*"):[1]

**Borrower:**    Baskloofs Stone Inc. and DeBeer Properties LLC (the "*Borrowers*")

**Guarantors:**  Unlimited, unconditional guaranties of Izak DeBeer (the "*Guarantor*", and together with the Borrower, the "Obligors").

**Lender:**      Truist Bank (the "*Bank*")

**Facility:**    SBA 504 Loan consisting of:

   A. A loan in a single drawdown (the "*Term Loan*"); and
   B. A loan in a single drawdown (the "*Interim Loan*"; together with the Term Loan, the "*Facility*")

**Loan Amount:**      $1,000,000   References in this letter referring to "Loan Amount" mean the total of the Term Loan and the Interim Loan.

   A. The amount of the Term Loan is limited to 40% of the total Project Cost
   B. The amount of the Interim Loan will be the total Loan Amount, less the Term Loan amount, limited to a maximum of 40% of the total Project Cost

**Sources and Uses:**   The following is a summary of the anticipated application of the proceeds of the Facility and the anticipated sources and uses of other funds associated with the project(s) to which the Facility relates:

---

[1] This summary of terms is intended as an outline of certain material terms of the Term Loan and does not purport to describe all of the terms and conditions, representations and warranties, covenants and other provisions that could be contained in the definitive loan documents.

Baskloofs Stone Inc.
September 25, 2023

| Asset Financed | Bank | CDC/SBA | Borrower Equity | Total |
|---|---|---|---|---|
| CRE Refinance | $500,000 | $475,000 | $250,000 | $1,225,000 |
| Interim Loan fee | $ - 0 - | $7,500 | $ - 0 - | $7,500 |
| Closing Costs | $ - 0 - | $17,500 | $ - 0 - | $17,500 |
| Total | $500,000 | $500,000 | $250,000 | $1,250,000 |

**Purpose:** The proceeds from the CRE 504 loans will be used to refinance one existing loans with Ameris Bank ▮▮▮▮▮▮▮ which were originally extended as SBA 7a loans for the acquisition of 145 Mallory Court in Tyrone, GA as well as some new funds for a new accessory structure, renovations to the stone yard and canopy.

**Term/Maturity Date:**   A.   120 months from the closing date of the Term Loan with a 300-month amortization.

B.   6 months from the closing date of the Interim Loan.

**Interest Rate:**   A: The "Rate" shall be a fixed rate equal to 7.35% per annum. The Rate is subject to a 90-day rate lock beginning 09/25/2023 and expiring on 12/23/2023. The Rate is subject to change if the loan does not close within this timeframe; provided, however, that the Bank may extend such expiration date, in its sole and absolute discretion and as expressly set forth in writing by the Bank.

B: The "Rate" equal the Index plus 0.00% and shall be re-priced every month. The "Index" shall be Wall Street Journal Prime Rate. The Rate is subject to a 90-day rate lock beginning 09/25/2023 and expiring on 12/23/2023. The Rate is subject to change if the loan does not close within this timeframe; provided, however, that the Bank may extend such expiration date, in its sole and absolute discretion and as expressly set forth in writing by the Bank.

**Payments:**   A.   Payments consisting of 119 consecutive installments of principal and interest estimated at time of this proposal of $3,679.39. The final payment equal to the unpaid balance of principal plus accrued and unpaid interest and any other amounts owed, due and payable on the Maturity Date.

B.   Interest only payments on amounts disbursed will be due monthly. The CDC will quote the payment on its long-term loan in its commitment letter to you.

The SBA requires that the Bank adjust the payment amount at least annually to amortize principal over the remaining term of the loan.

Baskloofs Stone Inc.
September 25, 2023

**Loan Origination Fee:**      $7,500 for the Interim Loan. All fees charged in connection with the SBA 504 portion of the financing package will be quoted by the CDC in its commitment letter to you.

**Collateral:**      Collateral shall consist of the following:
A. **Mini-Perm Loan:**
- A Mortgage, Deed of Trust or Deed to Secure Debt (as applicable, the "Security Instrument") providing Bank with a first priority mortgage lien/security interest in real property commonly known as **145 Mallory Court, Tyrone, GA** (the "Property"). The true legal description of the Property to be acceptable to Bank or Bank's closing attorney.
- Assignment of any and all leases, subleases, and tenancies now or hereafter covering all or any part of said Property and all rents and profits therefrom.
- All improvements now or hereafter located on the Property, all fixtures, and other attachments on the Property ("Improvements").

B. **Interim Loan:**
- A Mortgage, Deed of Trust or Deed to Secure Debt (as applicable, the "Security Instrument") providing Bank with a second priority mortgage lien/security interest in real property commonly known as **145 Mallory Court, Tyrone, GA** (the "Property"). The true legal description of the Property to be acceptable to Bank or Bank's closing attorney.
- Assignment of any and all leases, subleases, and tenancies now or hereafter covering all or any part of said Property and all rents and profits therefrom.
- All improvements now or hereafter located on the Property, all fixtures, and other attachments on the Property ("Improvements").

**Prepayment Penalty:**      If applicable, the amount of the prepayment fee is as follows:
1. During the first year after the date on which the loan is first disbursed, 5% of the total prepayment amount;
2. During the second year after the date on which the loan is first disbursed, 4% of the total prepayment amount;
3. During the third year after the date on which the loan is first disbursed, 3% of the total prepayment amount;
4. During the fourth year after the date on which the loan is first disbursed, 2% of the total prepayment amount; and
5. During the fifth year after the date on which the loan is first disbursed, 1% of the total prepayment amount.

Baskloofs Stone Inc.
September 25, 2023

**Payments by Auto-Debit:**   The Borrower agrees to maintain a deposit relationship with the Bank and execute an agreement authorizing the Bank to automatically debit all payments due pursuant to the Facility.

**Affirmative Covenants**: Usual and customary for Bank in transactions of this type, including without limitation: (i) delivery of updated financial information, including but not limited to current financial statements in form satisfactory to the Bank, and (ii) other information that may be reasonably required by the Bank and its counsel.

**Expenses and Indemnification:**    As further detailed below, Borrower will pay all reasonable costs and expenses of the Bank (including, without limitation, the reasonable fees, charges, and disbursements of the Bank's counsel (including in-house counsel) in connection with the preparation, administration, and enforcement of all documentation executed in connection with the Facility.

**Events of Default:**   Usual and customary for Bank in transactions of this type, including without limitation, the failure by any Obligor to pay when due, whether by acceleration or otherwise, any amount owed under the note evidencing the Facility.

**Representations and Warranties:**   Usual and customary for the Bank in transactions of this type

**Conditions Precedent:**      Bank's obligation to disburse the proceeds of the Facility is subject to certain conditions precedent which must be satisfied before the closing. In the event any of these conditions precedent is not fulfilled on or prior to the closing date, Bank may, in Bank's sole and absolute discretion, terminate this Commitment. The satisfaction of the conditions precedent is Borrower's responsibility and Borrower should take all such actions as are appropriate in order to assure that the necessary appraisals, inspections, reports, commitments, and other such matters are ordered or initiated and completed at the earliest possible time. These conditions precedent include the following (and all information, reports, and documents must be satisfactory to Bank in Bank's sole discretion):

1. Review, approval, and authorization of the Facility by the U.S. Small Business Administration. Any and all terms and conditions as imposed by the SBA Loan Authorization in order to satisfy the requirements therein shall be deemed applicable to this commitment as well.  In the event there is any discrepancy between the terms of the Commitment Letter and the loan authorization as issued and approved by the SBA for this loan, then the terms of the SBA loan authorization shall control.
2. Third party business valuation, commercial real estate appraisal, environmental inspection, and any other due diligence to be conducted by third party experts acceptable by Bank in form and substance satisfactory to Bank and subject to review and approval by Bank.
3. The negotiation, execution and delivery of definitive loan documentation for the Facility, which shall include: (a) an opinion of counsel for any non-individual Obligor, with respect to, among other things, the due formation of the respective entities and the due execution and enforceability of the Loan Documents, all in a form and substance satisfactory to Bank, and (b) satisfactory evidence that the Bank holds a properly

**4** | P a g e

Baskloofs Stone Inc.
September 25, 2023

      perfected, first priority lien in all of the collateral for the Facility, subject to no other liens other than those expressly consented to in writing by Bank.

4. Bank shall receive (a) a copy of any non-individual Obligor's organizational documents; (b) a borrowing resolution/consent authorizing the Facility, the pledge of Collateral to secure the Facility and the execution of the Loan Documents by the board of directors / shareholders / members or managers of Borrower, as applicable, and (c) a certificate of incumbency evidencing the appropriate officer and specimen signature of such person.

5. The absence of any action, suit, investigation, or proceeding pending or threatened in any court or before any arbitrator or governmental authority.

6. Satisfactory background checks and credit reports an all principals and entities.

7. Bank shall be in receipt of: (a) all financial, formation and other information required by the Bank on Borrower, Guarantor(s) and their constituent entities and any other entities specified by the Bank, including all due diligence materials to verify authority, identity and background information for regulatory purposes under applicable "know your customer" and anti-money laundering laws, as deemed necessary by the Bank in its sole and absolute discretion, and (b) such other information and due diligence deliveries as are requested by and acceptable to Bank, including, but not limited to, legal documentation and attorney opinion letters.

8. The funding of the Facility shall be subject to accuracy of representations and warranties as of the date of such loan and no event of default or incipient default under the Facility shall have occurred and be continuing as of the date of such loan or would result from making the Facility.  Additionally, there shall not have occurred, in the opinion of the Bank, any material adverse change in the business or financial condition of Borrower or any Guarantor or in any other state of facts submitted to the Bank in connection with the Facility, from that which existed at the time the Bank initially considered the proposed Facility.

9. Payment of all fees and expenses then due and payable.

10. Other usual and customary requirements for facilities of this type and appropriate for this transaction.

11. Appraisal of 145 Mallory Court, Tyrone, GA Minimum (As Is) value shall be $2,965,000 and remaining useful economic life of at least 25 years.

12. Loans at Ameris Bank (3) and Idea Financial (1) to be paid off & closed w/ any applicable lien filings terminated.

13. Intercreditor Subordination Agreement required for Shareholder Notes.  PM to provide the following information: Creditor Name, Note Date, Note Amt, Payments Permitted, Description of Payments Permitted, including #, frequency, and amount.  Copy of Note Required.

14. EIDL to be subordinated.

15. Transcripts of existing accounts being refinanced to be provided to bank for review prior to closing to ensure all payments have been made as agreed.

16. Lease between EPC and OC to be extended to match the term of the CRE loans.

17. Client to provide evidence of payment of Federal tax lien from May 2010 in the amount of $11,908 - Izak deBeer.

18. Truist GLOC to be decreased from $750,000 to $500,000.

19. Formal subordination agreement to be signed by Cogent at/prior to closing.

This Commitment Letter is subject to: (i) the preparation, execution and delivery of mutually acceptable loan documentation, including a note incorporating substantially the terms and conditions set forth herein; (ii) the absence of a material adverse change in the business, condition (financial or otherwise), results of operations, properties or prospects of the Borrower and its affiliates (if any) as reflected in financial data as of June 30, 2023; (iii) the accuracy of all representations which you have made or will make to the Bank and all information that you furnish to us and your compliance with the terms of this Commitment Letter; and (iv) a closing of the Facility on or prior to December 23, 2023.

Baskloofs Stone Inc.
September 25, 2023

All costs incurred by the Bank in connection with the proposed Facility, including but not limited to, the Bank's legal fees and expenses, appraisals, searches, reports and other third party costs (collectively "*Costs*"), shall be paid and/or reimbursed by Borrower, whether or not the proposed Facility closes, and your acknowledgement below authorizes the Bank to order and proceed with same, and to engage legal counsel, all at your expense and in reliance on this understanding. Borrower shall be responsible for all fees and expenses including, without limitation, legal fees and expenses, incurred by the Bank in enforcing its rights under this Commitment Letter. Borrower's obligation in respect of the costs and expenses referenced in this paragraph is in consideration for, among other things, the Bank's undertaking to underwrite the proposed financing and incur such Costs and shall survive the cancellation or termination of this Commitment Letter. If there are multiple parties comprising "Borrower" or "Guarantor", the defined terms shall refer to all such parties collectively, but each such party shall be jointly and severally liable under this Commitment Letter.

This Commitment Letter (i) constitutes the entire understanding between the Bank and Borrower in connection with the Facility as of the date hereof, (ii) supersedes any prior written or oral communications or understandings, and (iii) may be amended only by a writing signed by Borrower and Bank. If the Bank and Borrower enter into the proposed Facility, this Commitment Letter shall not survive closing of the Facility but shall be superseded by the documents evidencing the Facility. Neither the Bank nor Borrower shall be deemed to have entered into, signed or executed binding documents evidencing the Facility by virtue of this or any other communication at any time prior to the Bank's express acceptance of loan documents prepared by the Bank or its counsel and bearing Borrower's duly authorized signature.

This Commitment Letter is (i) not assignable, (ii) not intended to benefit any third party, and (iii) for Borrower's confidential use only and sent to Borrower on the condition that neither its existence nor its contents will be disclosed publicly or privately to any person or entity, except to those of Borrower's officers, employees, agents, counsel or accountants directly involved with the Facility and then only on the basis that it not be further disclosed.

This Commitment Letter shall constitute a binding obligation of the Bank for all purposes immediately upon the acceptance hereof by the Borrower in the manner provided herein; provided, however, that Bank's obligations under this Commitment Letter are contingent upon the Obligors being in compliance with all terms and conditions of any and all SBA rules and requirements governing the Facility and any written authorization which may be issued as to this Facility, and failure to comply with such will likewise terminate the terms and conditions of the Commitment Letter and Bank shall have no further obligations hereunder in such event. Notwithstanding any other provision of this Commitment Letter, the Bank's commitments and undertakings as set forth herein shall not be or become effective for any purpose unless and until this Commitment Letter shall have been accepted by the Borrower in the manner specified below.

6 | P a g e

Baskloofs Stone Inc.
September 25, 2023

If you are in agreement with the foregoing, please sign and return the enclosed copy of this Commitment Letter along with a deposit check in the amount of $5,000.00 to the Bank. Unless the Bank receives such copy of this Commitment Letter duly executed by an authorized officer of the Borrower prior to 5:00 p.m. (EST), on October 3, 2023 the Bank's obligations hereunder shall be deemed withdrawn and shall terminate on such date. In no event shall the Bank have any obligation to make the Term Loan available unless the closing shall have occurred on or prior to December 23, 2023; provided, however, that such date may be extended, in the Bank's sole and absolute discretion, if the Bank has agreed in writing to provide Borrower with additional time to provide any and all remaining information required as a condition of the Bank's credit approval and/or by SBA rules and requirements; provided, further, that after review and approval of all such additional information provided by the Borrower, the Bank, in its sole and absolute discretion, agrees to maintain the expiration date of the Rate Lock (as described above) of 12/23/2023. In addition to the foregoing, this Commitment Letter may be terminated at (i) Bank's option by written notice to the Borrower at the address set forth above upon the occurrence of default as defined within the note or this Commitment Letter, including a change of ownership for any Obligor, or (ii) any time by mutual agreement. If the Facility does not timely close for any reason, the amount deposited with the Bank will be credited towards Costs, and any amount of the deposit not applied to the Bank's Costs will be refunded to Borrower. Borrower understands that possible additional funds may be necessary to pay for any outstanding Costs.

**THIS COMMITMENT LETTER WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF GEORGIA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.**

**TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE BORROWER AND THE BANK HEREBY WAIVES JURY TRIAL IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS COMMITMENT LETTER OR ANY OTHER DOCUMENTS CONTEMPLATED HEREBY.**

Baskloofs Stone Inc.
September 25, 2023

AGREED AND ACCEPTED this ___27th___ day of ___September___, 2023:

**Borrower:**
**Baskloofs Stone Inc.**
By: _____
    Name: __Izak Debeer__
    Title: __CEO__

**Co-Borrower:**
**DeBeer Properties LLC**
By: _____
    Name: __Izak Debeer__
    Title: __Member__

**Guarantor:**
By: _____
    Name: __Izak DeBeer__, Individually
    Date: __9-27-23__

**9** | P a g e

Baskloofs Stone Inc.
September 25, 2023

This Commitment Letter may be executed in any number of separate counterparts, each of which shall collectively and separately, constitute one agreement. Upon acceptance by you as provided herein, this Commitment Letter shall supersede all understandings and agreements between the parties hereto in respect of the transactions contemplated hereby.

We look forward to working with you on this transaction.

Very truly yours,

TRUIST BANK

By:_____*Ronald Smith*_____

Name: Ronald D. Smith
SBA Business Development Officer



August 29, 2023                                                             revised 9/25/2023

Baskloofs Stone Inc.
145 Mallory Court
Tyrone, GA  30290

Attention:  Guarantors name here

Re: SBA 504 Loan Commitment Letter

Truist Bank (the "*Bank*") is pleased to confirm that the Bank has approved your request for an SBA 504 loan subject to the following terms and conditions set forth in this letter (the "*Commitment Letter*"):[1]

**Borrower:**    Baskloofs Stone Inc. (the "*Borrower*")

**Guarantors:**  Unlimited, unconditional guaranties of Izak DeBeer (the "*Guarantor*", and together with the Borrower, the "Obligors").

**Lender:**      Truist Bank (the "*Bank*")

**Facility:**    SBA 504 Loan consisting of:

    A.  A loan in a single drawdown (the "*Term Loan*"); and
    B.  A loan in a single drawdown (the "*Interim Loan*"; together with the Term Loan, the "*Facility*")

**Loan Amount:**    $1,405,000   References in this letter referring to "Loan Amount" mean the total of the Term Loan and the Interim Loan.

    A.  The amount of the Term Loan is limited to 39% of the total Project Cost
    B.  The amount of the Interim Loan will be the total Loan Amount, less the Term Loan amount, limited to a maximum of 39% of the total Project Cost

**Sources and Uses:**   The following is a summary of the anticipated application of the proceeds of the Facility and the anticipated sources and uses of other funds associated with the project(s) to which the Facility relates:

| Asset Financed | Bank | | Borrower | Total |
| --- | --- | --- | --- | --- |

---

[1] This summary of terms is intended as an outline of certain material terms of the Term Loan and does not purport to describe all of the terms and conditions, representations and warranties, covenants and other provisions that could be contained in the definitive loan documents.

Baskloofs Stone Inc.
September 25, 2023

|  |  | CDC/SBA | Equity |  |
|---|---|---|---|---|
| Equipment Refinance | $702,500 | $682,500 | $395,000 | $1,780,000 |
| Interim Loan fee | $ - 0 - | $10,500 | $ - 0 - | $10,500 |
| Closing Costs | $ - 0 - | $9,500 | $ - 0 - | $9,500 |
| Total | $702,500 | $702,500 | $395,000 | $1,800,000 |

**Purpose:**    Proceeds from this equipment 504 loan will be used to refinance two Ameris Bank loans (███████████████████████) which were used to acquire production line equipment as well as other equipment items including 3 trucks, a Lazer Template System, Robo Saw, accounting system, water system, compressor and forklift. The current balances on these two loans is estimated to be $362,123.66 and $1,040,223.60, respectively as of the July 10, 2023 business debt schedule provided. Both of these loans were done using the SBA 7a loan program.

**Term/Maturity Date:**    A.    84 months from the closing date of the Term Loan with a 1200-month amortization.

B.    6 months from the closing date of the Interim Loan.

**Interest Rate:**    A: The "Rate" shall be a fixed rate equal to 8.35% per annum. The Rate is subject to a 90-day rate lock beginning 09/25/2023 and expiring on 12/23/2023. The Rate is subject to change if the loan does not close within this timeframe; provided, however, that the Bank may extend such expiration date, in its sole and absolute discretion and as expressly set forth in writing by the Bank.

B: The "Rate" equal the Index plus 0.00% and shall be re-priced every month. The "Index" shall be Wall Street Journal Prime Rate. The Rate is subject to a 90-day rate lock beginning 09/25/2023 and expiring on 12/23/2023. The Rate is subject to change if the loan does not close within this timeframe; provided, however, that the Bank may extend such expiration date, in its sole and absolute discretion and as expressly set forth in writing by the Bank.

**Payments:**    A.    Payments consisting of 83 consecutive installments of principal and interest estimated at time of this proposal of $8,321.24. The final payment equal to the unpaid balance of principal plus accrued and unpaid interest and any other amounts owed, due and payable on the Maturity Date.

B.    Interest only payments on amounts disbursed will be due monthly. The CDC will quote the payment on its long-term loan in its commitment letter to you.

Baskloofs Stone Inc.
September 25, 2023

The SBA requires that the Bank adjust the payment amount at least annually to amortize principal over the remaining term of the loan.

**Loan Origination Fee:**     $10,500 for the Interim Loan. All fees charged in connection with the SBA 504 portion of the financing package will be quoted by the CDC in its commitment letter to you.

**Collateral:**    Collateral shall consist of the following:
   A. **Mini-Perm Loan:**
      - Equipment lien on all equipment to be verified by appraisal creating a first lien position.
      - Blanket lien on all business assets. LOC will have a first lien on AR And inventory and a second on all other ABA. 504 a/b will be subordinated to the AR and inventory on the LOC only.
   B. **Interim Loan:**
      - Equipment lien on all equipment to be verified by appraisal creating a second lien position.
      - Blanket lien on all business assets. LOC will have a first lien on AR And inventory and a second on all other ABA. 504 a/b will be subordinated to the AR and inventory on the LOC only.

**Prepayment Penalty:**       If applicable, the amount of the prepayment fee is as follows:
   1. During the first year after the date on which the loan is first disbursed, 5% of the total prepayment amount;
   2. During the second year after the date on which the loan is first disbursed, 4% of the total prepayment amount;
   3. During the third year after the date on which the loan is first disbursed, 3% of the total prepayment amount;
   4. During the fourth year after the date on which the loan is first disbursed, 2% of the total prepayment amount; and
   5. During the fifth year after the date on which the loan is first disbursed, 1% of the total prepayment amount.

**Payments by Auto-Debit:**   The Borrower agrees to maintain a deposit relationship with the Bank and execute an agreement authorizing the Bank to automatically debit all payments due pursuant to the Facility.

**Affirmative Covenants**: Usual and customary for Bank in transactions of this type, including without limitation: (i) delivery of updated financial information, including but not limited to current financial statements in form satisfactory to the Bank, and (ii) other information that may be reasonably required by the Bank and its counsel.

3 | P a g e

Baskloofs Stone Inc.
September 25, 2023

**Expenses and Indemnification:**    As further detailed below, Borrower will pay all reasonable costs and expenses of the Bank (including, without limitation, the reasonable fees, charges, and disbursements of the Bank's counsel (including in-house counsel) in connection with the preparation, administration, and enforcement of all documentation executed in connection with the Facility.

**Events of Default:**    Usual and customary for Bank in transactions of this type, including without limitation, the failure by any Obligor to pay when due, whether by acceleration or otherwise, any amount owed under the note evidencing the Facility.

**Representations and Warranties:**    Usual and customary for the Bank in transactions of this type

**Conditions Precedent:**    Bank's obligation to disburse the proceeds of the Facility is subject to certain conditions precedent which must be satisfied before the closing. In the event any of these conditions precedent is not fulfilled on or prior to the closing date, Bank may, in Bank's sole and absolute discretion, terminate this Commitment. The satisfaction of the conditions precedent is Borrower's responsibility and Borrower should take all such actions as are appropriate in order to assure that the necessary appraisals, inspections, reports, commitments, and other such matters are ordered or initiated and completed at the earliest possible time. These conditions precedent include the following (and all information, reports, and documents must be satisfactory to Bank in Bank's sole discretion):

1. Review, approval, and authorization of the Facility by the U.S. Small Business Administration. Any and all terms and conditions as imposed by the SBA Loan Authorization in order to satisfy the requirements therein shall be deemed applicable to this commitment as well. In the event there is any discrepancy between the terms of the Commitment Letter and the loan authorization as issued and approved by the SBA for this loan, then the terms of the SBA loan authorization shall control.
2. Third party business valuation, commercial real estate appraisal, environmental inspection, and any other due diligence to be conducted by third party experts acceptable by Bank in form and substance satisfactory to Bank and subject to review and approval by Bank.
3. The negotiation, execution and delivery of definitive loan documentation for the Facility, which shall include: (a) an opinion of counsel for any non-individual Obligor, with respect to, among other things, the due formation of the respective entities and the due execution and enforceability of the Loan Documents, all in a form and substance satisfactory to Bank, and (b) satisfactory evidence that the Bank holds a properly perfected, first priority lien in all of the collateral for the Facility, subject to no other liens other than those expressly consented to in writing by Bank.
4. Bank shall receive (a) a copy of any non-individual Obligor's organizational documents; (b) a borrowing resolution/consent authorizing the Facility, the pledge of Collateral to secure the Facility and the execution of the Loan Documents by the board of directors / shareholders / members or managers of Borrower, as applicable, and (c) a certificate of incumbency evidencing the appropriate officer and specimen signature of such person.
5. The absence of any action, suit, investigation, or proceeding pending or threatened in any court or before any arbitrator or governmental authority.
6. Satisfactory background checks and credit reports an all principals and entities.

Baskloofs Stone Inc.
September 25, 2023

7.  Bank shall be in receipt of: (a) all financial, formation and other information required by the Bank on Borrower, Guarantor(s) and their constituent entities and any other entities specified by the Bank, including all due diligence materials to verify authority, identity and background information for regulatory purposes under applicable "know your customer" and anti-money laundering laws, as deemed necessary by the Bank in its sole and absolute discretion, and (b) such other information and due diligence deliveries as are requested by and acceptable to Bank, including, but not limited to, legal documentation and attorney opinion letters.

8.  The funding of the Facility shall be subject to accuracy of representations and warranties as of the date of such loan and no event of default or incipient default under the Facility shall have occurred and be continuing as of the date of such loan or would result from making the Facility.  Additionally, there shall not have occurred, in the opinion of the Bank, any material adverse change in the business or financial condition of Borrower or any Guarantor or in any other state of facts submitted to the Bank in connection with the Facility, from that which existed at the time the Bank initially considered the proposed Facility.

9.  Payment of all fees and expenses then due and payable.

10. Other usual and customary requirements for facilities of this type and appropriate for this transaction.

11. Equipment Appraisal required with a minimum valuation of $1,780,000 and remaining useful economic life of 10 years

12. Loans at Ameris Bank (3) and Idea Financial (1) to be paid off & closed w/ any applicable lien filings terminated.

13. Intercreditor Subordination Agreement required for Shareholder Notes.  PM to provide the following information:  Creditor Name, Note Date, Note Amt, Payments Permitted, Description of Payments Permitted, including #, frequency, and amount.  Copy of Note Required.

14. EIDL to be subordinated.

15. Transcripts of existing accounts being refinanced to be provided to bank for review prior to closing to ensure all payments have been made as agreed.

16. Lease between EPC and OC to be extended to match the term of the CRE loans.

17. Client to provide evidence of payment of Federal tax lien from May 2010 in the amount of $11,908 - Izak deBeer.

18. Truist GLOC to be decreased from $750,000 to $500,000.

19. Formal subordination agreement to be signed by Cogent at/prior to closing.

This Commitment Letter is subject to: (i) the preparation, execution and delivery of mutually acceptable loan documentation, including a note incorporating substantially the terms and conditions set forth herein; (ii) the absence of a material adverse change in the business, condition (financial or otherwise), results of operations, properties or prospects of the Borrower and its affiliates (if any) as reflected in financial data as of June 30, 2023; (iii) the accuracy of all representations which you have made or will make to the Bank and all information that you furnish to us and your compliance with the terms of this Commitment Letter; and (iv) a closing of the Facility on or prior to December 23, 2023.

All costs incurred by the Bank in connection with the proposed Facility, including but not limited to, the Bank's legal fees and expenses, appraisals, searches, reports and other third party costs (collectively "*Costs*"), shall be paid and/or reimbursed by Borrower, whether or not the proposed Facility closes, and your acknowledgement below authorizes the Bank to order and proceed with same, and to engage legal counsel, all at your expense and in reliance on this understanding. Borrower shall be responsible for all fees and expenses including, without limitation, legal fees and expenses, incurred by the Bank in enforcing its rights under this Commitment Letter.

**5 |** P a g e

Baskloofs Stone Inc.
September 25, 2023

Borrower's obligation in respect of the costs and expenses referenced in this paragraph is in consideration for, among other things, the Bank's undertaking to underwrite the proposed financing and incur such Costs and shall survive the cancellation or termination of this Commitment Letter. If there are multiple parties comprising "Borrower" or "Guarantor", the defined terms shall refer to all such parties collectively, but each such party shall be jointly and severally liable under this Commitment Letter.

This Commitment Letter (i) constitutes the entire understanding between the Bank and Borrower in connection with the Facility as of the date hereof, (ii) supersedes any prior written or oral communications or understandings, and (iii) may be amended only by a writing signed by Borrower and Bank. If the Bank and Borrower enter into the proposed Facility, this Commitment Letter shall not survive closing of the Facility but shall be superseded by the documents evidencing the Facility. Neither the Bank nor Borrower shall be deemed to have entered into, signed or executed binding documents evidencing the Facility by virtue of this or any other communication at any time prior to the Bank's express acceptance of loan documents prepared by the Bank or its counsel and bearing Borrower's duly authorized signature.

This Commitment Letter is (i) not assignable, (ii) not intended to benefit any third party, and (iii) for Borrower's confidential use only and sent to Borrower on the condition that neither its existence nor its contents will be disclosed publicly or privately to any person or entity, except to those of Borrower's officers, employees, agents, counsel or accountants directly involved with the Facility and then only on the basis that it not be further disclosed.

This Commitment Letter shall constitute a binding obligation of the Bank for all purposes immediately upon the acceptance hereof by the Borrower in the manner provided herein; provided, however, that Bank's obligations under this Commitment Letter are contingent upon the Obligors being in compliance with all terms and conditions of any and all SBA rules and requirements governing the Facility and any written authorization which may be issued as to this Facility, and failure to comply with such will likewise terminate the terms and conditions of the Commitment Letter and Bank shall have no further obligations hereunder in such event. Notwithstanding any other provision of this Commitment Letter, the Bank's commitments and undertakings as set forth herein shall not be or become effective for any purpose unless and until this Commitment Letter shall have been accepted by the Borrower in the manner specified below.

If you are in agreement with the foregoing, please sign and return the enclosed copy of this Commitment Letter along with a deposit check in the amount of $2,500.00 to the Bank. Unless the Bank receives such copy of this Commitment Letter duly executed by an authorized officer of the Borrower prior to 5:00 p.m. (EST), on October 3, 2023 the Bank's obligations hereunder shall be deemed withdrawn and shall terminate on such date. In no event shall the Bank have any obligation to make the Term Loan available unless the closing shall have occurred on or prior to December 23, 2023; provided, however, that such date may be extended, in the Bank's sole and absolute discretion, if the Bank has agreed in writing to provide Borrower with additional time to

6 | P a g e

Baskloofs Stone Inc.
September 25, 2023

provide any and all remaining information required as a condition of the Bank's credit approval and/or by SBA rules and requirements; provided, further, that after review and approval of all such additional information provided by the Borrower, the Bank, in its sole and absolute discretion, agrees to maintain the expiration date of the Rate Lock (as described above) of 12/23/2023. In addition to the foregoing, this Commitment Letter may be terminated at (i) Bank's option by written notice to the Borrower at the address set forth above upon the occurrence of default as defined within the note or this Commitment Letter, including a change of ownership for any Obligor, or (ii) any time by mutual agreement. If the Facility does not timely close for any reason, the amount deposited with the Bank will be credited towards Costs, and any amount of the deposit not applied to the Bank's Costs will be refunded to Borrower. Borrower understands that possible additional funds may be necessary to pay for any outstanding Costs.

**THIS COMMITMENT LETTER WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF GEORGIA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.**

**TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE BORROWER AND THE BANK HEREBY WAIVES JURY TRIAL IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS COMMITMENT LETTER OR ANY OTHER DOCUMENTS CONTEMPLATED HEREBY.**

Baskloofs Stone Inc.
September 25, 2023

This Commitment Letter may be executed in any number of separate counterparts, each of which shall collectively and separately, constitute one agreement. Upon acceptance by you as provided herein, this Commitment Letter shall supersede all understandings and agreements between the parties hereto in respect of the transactions contemplated hereby.

We look forward to working with you on this transaction.

Very truly yours,

TRUIST BANK

By:_____*Ronald Smith*_____

      Name: Ronald D. Smith
      SBA Business Development Officer

**8** | P a g e

Baskloofs Stone Inc.
September 25, 2023

AGREED AND ACCEPTED this ___27th___ day of ___September___, 2023:

**Borrower:**
**Baskloofs Stone Inc.**
By: _____
      Name: ___Zak Debeer___
      Title: ___CEO___

**Guarantor:**
By: _____
      Name: ___Zak DeBeer, Individually___
      Date: ___9-27-23___

9 | P a g e

# Exhibit
# B

6

# DRAFT AUTHORIZATION FOR LOAN CLOSING FEES
# AND LOAN PAYMENTS AND FEES

| Account Holder | | | |
| Baskloofs Stone Inc | | | |
| Street Address | City | State | Zip Code |
| 145 Mallory Ct | Tyrone | GA | 30290-2739 |

**The Obligation:**

| Borrower Name | Obligor Number | Obligation Number |
| Baskloofs Stone Inc | ███████ | ███████ |

**Authorization:**

Account Holder hereby authorizes Truist Bank ("Truist") to iniate electronic debits from the deposit account designated below in amounts sufficient to pay the following in connection with the Obligation referenced above (***Check all that apply***):

☐ **Closing Costs, Fees and Expenses.** Loan closing fees and reimburseable expenses incurred by Truist in connection with the Obligation, including without limitation any origination fee, commitment fee, documentation or loan processing fee, appraisal fee, evaluation fee, examination fee, inspection fee, filing fee, recording fee and attorneys' fee, as applicable.

☒ **Loan Payments and Other Fees, Costs and Expenses.** All scheduled loan payments, both principal and accrued interest as the same become due and payable, together with any other amounts that may become due to Truist under the terms of the Obliation and the related loan documents, including without limitation any inspection fee, examination fee, re-appraisal fee, annual fee, renewal fee, release fee, late fee, documentation or loan processing fee, filing fee, recording fee, attorneys' fee, amounts expended by Truist to which it is entitled to reimbursement, and any other fees, as applicable.

**Overdrafts and Insufficient Funds.** Account Holder agrees that if the account does not have sufficient funds available on the day Truist tries to deduct the fee and/or payment amount(s), Truist, in its sole discretion shall determine whether or not a deduction will be made. If sufficient funds are not available, Truist may attempt to continue to deduct the payment from the account, but is under no obligation to do so. Account Holder acknowledges and agrees to pay to Truist its then current fee for returned items, which may be assess as a fee to the Obligation or charged directly to the Borrower, in the event there is insuficient funds when Truist initiates a draft of amounts pursuant to this Authorization.

**Agreements.**

Account Holder agrees that the electronic debits authorized pursuant to this Authorization will comply with all applicable law (including but not limited to laws administered by the U.S. Office of Foreign Assets Control) and with NACHA Rules and Guidelines. This authorization will remain effective until the Account Holder provides written notice of cancellation of this draft authorization to Truist at the notice address provided in the loan documents. Truist reserves the right to cancel this draft authorization at any time. The undersigned represents to Truist that s/he is an authorized signatory of the Account Holder on the account designated below and that the account is a business account.

| Depository Bank Name | Deposit Account Number | |
| Truist | ███████ 0274 | ☒ Checking ☐ Savings ☐ Money Market |

| Routing Transit | Name of Deposit Account Owner |
| ███████ | Baskloofs Stone Inc |

| Additional Amount (if any) to be drafted above the amount authorized above. |
| |

12/15/27
Date

By: _____
Signature of Authorized Signatory of Account Holder

Signatory Name: IZAK C. DE BER

Title: Manager/ ███████ president

# Exhibit C

# SECURITY AGREEMENT

This Security Agreement (this "Agreement") is executed and delivered on December 15, 2023 from Baskloofs Stone, Inc. (collectively, whether one or more, the "Debtor") to Truist Bank ("Lender").

1.     <u>LOAN</u>. Lender is willing to make a loan in the original principal amount of SEVEN HUNDRED FORTY-EIGHT THOUSAND TWO HUNDRED FIFTY AND NO/100 DOLLARS ($748,250.00) (the "Loan") to Baskloofs Stone, Inc., a Georgia corporation (collectively, whether one or more, the "Borrower") subject to the obligations of Debtor contained in this Agreement. The security interest created in this Agreement constitutes continuing collateral security for all of the following obligations, whether now existing or hereafter incurred (collectively, the "Obligations"): (i) the full and prompt payment, when due, of the indebtedness evidenced by that certain promissory note made payable to Lender from Borrower (the "Note"), including all renewals, modifications, and extensions thereof; (ii) the full and prompt compliance with all covenants and agreements of Debtor under this Agreement, the Note, and any other documents evidencing and/or relating to the Loan (collectively, the "Loan Documents"); and (iii) the full and prompt payment, when due, of any and all other present and future indebtedness, liabilities and obligations of Debtor to Lender, including all renewals, modifications, and extensions thereof.

2.     <u>POWER AND AUTHORIZATION</u>. Debtor has duly authorized the execution and delivery of this Agreement to Lender which will not violate any applicable law or agreement to which Debtor is a party to or may be bound or affected by. Debtor represents and warrants to Lender that the following statements are true and correct: (i) the Debtor is organized and/or resides in the State(s) of Georgia; (ii) the Debtor's mailing address(es) is/are Baskloofs Stone, Inc., 145 Mallory Court, Tyrone, Georgia 30290; and (iii) Baskloofs Stone, Inc. is/are the correct legal name of the Debtor as shown on the public organic record of the Debtor's jurisdiction of organization that shows the Debtor to be organized. For any Debtor which is an entity, they are and shall remain duly organized, validly existing and in good standing under the laws of the state(s) in which they were formed and authorized to conduct business, have the full power and authority to carry on its business operations and are duly licensed or qualified under the laws of each jurisdiction in which they operate. Debtor shall not change its name, reorganize, consolidate, merge, or change its jurisdiction of organization/residence unless it has provided Lender thirty (30) days' prior written notice thereof and executed or authorized, at the request of the Lender, such additional financing statements to be filed in such jurisdictions as the Lender may deem necessary in its sole discretion.

3.     <u>GRANT OF COLLATERAL</u>. As security for the full and timely payment and performance of the Obligations, Debtor hereby grants a continuing security interest in all of the following property of the Debtor, being defined as the Collateral, whether now owned or hereafter acquired or arising, wherever located:

a.     *Equipment.* A security interest in all equipment, including furniture, furnishings and other tangible property of every kind, nature and description whatsoever, whether now owned or hereafter acquired by Debtor, including any appurtenances and additions thereto, and substitutions and replacements thereof, wherever located, including all tools, parts and accessories used in connection therewith.

b.     *Trade Fixtures.* A security interest in all of Debtor's trade fixtures and appurtenances thereto, whether now owned or hereafter acquired, and such other goods, chattels,

equipment and other personal property used for a particular trade or purpose of any kind which are affixed or in any manner attached to real property and/or structures thereon, including all attachments, additions and accessions thereto, and replacements thereof, however attached or affixed, together with all tools, parts, and equipment now or hereafter used in connection with the foregoing.

c. *Inventory.* A security interest in all of Debtor's inventory, including all goods, merchandise, raw materials, goods in process, goods on display, finished goods and other tangible property, wherever located, now owned or hereafter acquired and held for sale or lease or furnished under contracts for lease or consignment, together with such leases and contracts, and all additions and accessions thereto, and all documents evidencing title thereto, and all products and proceeds thereof, whether in the possession of Debtor, bailee or any other person.

d. *Accounts.* A security interest in all accounts now owned or existing as well as any and all that may hereafter arise or be acquired by Debtor, and all the proceeds and products thereof, including, without limitation, all notes, drafts, acceptances, instruments and chattel paper arising therefrom, and all returned or repossessed goods arising from or relating to any accounts, or other proceeds of any sale or other disposition of inventory.

e. *Instruments.* A security interest, pledge and assignment in all of Debtor's instruments, whether now owned or hereafter arising or acquired by Debtor, and all products and proceeds thereof.

f. *Chattel Paper.* A security interest in all of Debtor's interests in chattel paper, lease agreements, contracts and other documents or instruments, whether now owned or hereafter acquired, whether electronic or tangible, evidencing any and all monetary obligations, leases, debts, and/or security interests in favor of Debtor.

g. *General Intangibles.* A security interest in all general intangibles and other personal property now owned or hereafter acquired by Debtor other than goods, accounts, chattel paper, documents or instruments.

h. *Documents.* A security interest in all of Debtor's documents, including, but not limited to, agreements, plans, authorizations, permits, consents, licenses, approvals and contracts and other instruments of any kind, whether now owned or hereafter acquired, and all products and proceeds thereof.

i. *Farm Products.* A security interest, pledge and assignment in all of Debtor's farm products, whether now owned or hereafter arising or acquired by Debtor, and all products and proceeds thereof.

j. *Deposit Accounts.* A security interest, pledge and assignment in all of Debtor's deposit accounts, whether now owned or hereafter arising or acquired by Debtor, and all products and proceeds thereof.

k. *Investment Property.* A security interest, pledge and assignment in all of Debtor's investment property, whether now owned or hereafter arising or acquired by Debtor, and all products and proceeds thereof.

l. *Fixtures.* A security interest in all of Debtor's fixtures and appurtenances thereto, whether now owned or hereafter acquired, and such other goods, chattels, equipment and other personal property affixed or in any manner attached to real property and/or structures thereon, including all attachments, additions and accessions thereto, and replacement thereof, however attached or affixed, together with all tools, parts, and equipment now or hereafter used in connection with the foregoing.

4.    TITLE TO COLLATERAL. Except as disclosed and consented to by Lender in writing, Debtor (i) owns free and clear title to the Collateral, with the exception of liens for taxes not presently due and payable and liens or security interests in favor of Lender; and (ii) has not entered into, granted or permitted the filing or attachment of any liens or security interests against the Collateral that would be prior to, or that may in any way be superior to, Lender's rights in and to the Collateral. Debtor further represents and warrants that title to all Collateral is held in Debtor's exact legal name and is properly reflected herein.

5.    SALE OF COLLATERAL. Debtor shall not sell, lease, transfer or otherwise dispose of any of the Collateral other than in the ordinary course of business without the prior written consent of Lender. If Debtor should desire to sell any of the Collateral outside the course of ordinary business, Lender shall designate a release price or terms of a collateral substitution, along with any other terms and conditions determined in the sole and absolute discretion of Lender. So long as any of the Obligations shall remain outstanding, Debtor shall not transfer any of the Collateral to any other person or entity without the express prior written consent of Lender.

6.    COLLATERAL OBLIGATIONS. Debtor must promptly notify Lender in writing of any change in location of the Collateral, specifying the new location. Upon three (3) days written notice, Debtor shall permit any representative of Lender to visit, examine, inspect and test the Collateral as Lender deems reasonably appropriate to ensure Debtor's compliance with this Agreement, at Debtor's sole cost and expense. Debtor must: (i) maintain the Collateral in good condition; (ii) pay promptly all taxes, judgments, or charges of any kind levied or assessed thereon; and (iii) keep current all rent or mortgage payments due, if any, on premises where the Collateral is located.

7.    AUTHORIZATION TO FILE FINANCING STATEMENTS. Debtor hereby authorizes Lender (including its legal counsel, representative or agent), at any time, to file without the signature of the Debtor, as permitted by law, Uniform Commercial Code financing statements and amendments that describe the Collateral set forth in this Agreement in such jurisdictions as Lender may deem necessary or desirable in order to perfect, amend, continue or terminate the security interests granted by the Debtor under this Agreement. All terms defined in the Uniform Commercial Code of the State(s) of Georgia, as it may be amended from time to time (the "UCC") and used herein shall have the same definitions herein as specified therein. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term shall have the meaning specified in Article 9. Debtor shall execute all documentation requested in Lender's sole and absolute discretion to perfect its security interest in the Collateral pursuant to the UCC, including, but not limited to (i) acknowledgments from any bailee having possession of any of the Collateral confirming that they hold possession of the Collateral on behalf of the Lender, (ii) agreements evidencing the transfer of the Collateral to Lender's control for any investment property, deposit accounts, letter-of-credit rights, or electronic chattel paper; and (iii) other agreements or documentation to ensure the continued perfection and priority of the Lender's security interest in the Collateral and of the preservation of its rights therein, regardless of the effectiveness the Uniform Commercial Code in any jurisdiction. If applicable, Debtor will cooperate with Lender in obtaining a Control Agreement satisfactory to Lender with respect to any deposit accounts or investment property, or in otherwise obtaining control or possession of that or any other

Collateral. Debtor will pay the filing and recording costs of any such documents relating to Lender's security interest.

8.    ATTORNEY IN FACT. Debtor hereby irrevocably appoints Lender the Debtor's attorney-in-fact and proxy, with full authority and in the name of the Debtor, in Lender's discretion, to take any action and to execute any instrument which Lender may deem necessary accomplish the purposes of this Agreement, including, without limitation: (i) to obtain and adjust insurance required to be maintained under this Agreement; (ii) to ask, demand, collect, sue for, recover, compound, receive, and give receipts for moneys due and to become due under or in respect of any of the Collateral; (iii) to receive, endorse, and collect any checks, drafts or other instruments, documents, and chattel paper in connection with this Agreement; and (iv) to file any claims or take any action or institute any proceeding which Lender may deem necessary for the collection of any of the Collateral or otherwise to enforce the rights of Lender with respect to any of the Collateral. Debtor hereby ratifies and approves all acts of said attorney and Lender shall have no liability to Debtor for any act or omission as such attorney. The powers conferred on Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

9.    EVENT OF DEFAULT. An event of default (an "Event of Default") shall be deemed to have occurred hereunder upon any of the following: (i) nonpayment, when due, of any principal, accrued interest, premium, fee or other charge due under the Note; or (ii) the occurrence of any event or condition which constitutes a default under the terms of this Agreement or the Loan Documents. Upon the occurrence of an Event of Default, Lender may declare the entire unpaid balance of the Note and all other indebtedness of Borrower to Lender, including but not limited to accrued interest, fees and other costs to be immediately due and payable without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived. Upon the occurrence of an Event of Default as defined in this Agreement, the Note or the Loan Documents, Lender may declare the entire unpaid balance of the Note and all other indebtedness of Debtor to Lender, including but not limited to accrued interest, fees and other costs to be immediately due and payable without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived.

10.    ADDITIONAL REMEDIES. Upon the occurrence of an Event of Default as defined in this Agreement, the Note, or the Loan Documents, Lender may, in addition to declaring the entire unpaid balance of the Note and all other indebtedness of Debtor to Lender immediately due and payable, take all such other actions deemed necessary in the sole and absolute discretion of Lender, including, but not limited to the following: (i) foreclose upon Lender's security instruments upon the Collateral, in any manner and order available under law and as Lender may determine in its sole and absolute discretion; (ii) enter the premises occupied by Debtor and take possession of the Collateral; (iii) expend any such funds necessary to remedy the Event of Default, with such amounts expended by Lender being added to the indebtedness secured by the Note; (iv) exercise each and every right and remedy granted to Lender under this Agreement, the Note, the Loan Documents, and under any other applicable law or at equity; and (v) exercise any

and all rights of setoff which Lender may have against any account, fund, or property of any kind, tangible or intangible, owned by Debtor. The rights, remedies, powers, and privileges provided for in this Agreement shall not be deemed exclusive but shall be cumulative and shall be in addition to all other rights, remedies, powers, and privileges in Lender's favor at law or in equity. Neither the failure nor delay on the part of Lender to exercise any right, remedy, power, or privilege under this Agreement, the Note, or the Loan Documents upon the occurrence of any Event of Default or otherwise shall operate as a waiver thereof or impair any such right, remedy, power, or privilege of Lender. No waiver of any Event of Default shall affect any later Event of Default or otherwise impair any rights of Lender. No single, partial, or full exercise of any rights, remedies, powers, and privileges by Lender shall preclude further or other exercise thereof. No course of dealing between Lender and Debtor shall operate as, or be deemed to constitute a waiver of, Lender's rights under this Agreement, the Note, or the Loan Documents or affect the duties or obligations of Debtor thereunder.

11.    DISPOSITION OF COLLATERAL.  Lender shall have the right to sell, lease or otherwise dispose of the Collateral following an Event of Default, the proceeds of which will be applied against the amounts owed under this Agreement, the Note and the Loan Documents.  Lender, in its sole and absolute discretion, may (i) accept any form of consideration in exchange for the Collateral; (ii) purchase all or any part of the Collateral at public or, if permitted by law, private sale; and (iii) remove and store the Collateral at Debtor's sole cost and expense.  Prior to any sale of the Collateral, Lender will provide Debtor at least five (5) business days' notice prior to such proposed action, which shall constitute fair and reasonable notice.  Proceeds from any disposition of the Collateral shall be applied in such order as Lender may determine against the following:

(a)    Towards the costs and expenses of taking, storing, preserving, transporting, insuring, repairing, holding and selling the Collateral, including any legal costs and attorney's fees;

(b)    Towards the expenses of satisfying any liens, security interest or encumbrances on or in the Collateral which may be prior to the lien or security interests of Lender; and

(c)    To unpaid interest, then to unpaid principal, due to Lender under the Note along with any other indebtedness due from Debtor to Lender.

12.    RIGHT OF SETOFF.  Following an Event of Default, to the extent permitted by applicable law, Lender shall have a right of setoff, as well as a lien and security agreement against all of Debtor's accounts with Lender, including but not limited to any balance of any deposit, trust or agency account, or any other bank account with Lender.  Lender may administratively freeze all such accounts to protect its rights under this Agreement.

13.    INSURANCE.  Debtor shall maintain insurance against the Collateral in such amounts, in such types and against such hazards and liabilities as may be reasonably required by Lender.  All such policies of insurance shall be in form and substance and with insurance companies satisfactory to Lender, and Debtor shall deliver evidence of same as Lender may request.  Lender shall be designated as Lender's loss payee, or such other designation as Lender may elect under any such policies, as its interests may appear. Debtor hereby assigns to Lender any proceeds of such policies and all unearned premiums thereon and authorizes and empowers Lender to collect such sums and to execute and endorse in Debtor's name all proofs of loss, drafts, checks and any other documents necessary for Lender to obtain such payments.

14.    <u>LIENS AND ENCUMBRANCES</u>.  Debtor shall not incur or permit any encumbrance, pledge or lien upon or against any of the Collateral, except: (i) liens or security interests required by this Agreement; (ii) liens or security interests which have approved in writing by Lender and expressly permitted within the Loan Documents; or(iii) liens for taxes, assessments and other governmental charges not yet due and payable;

15.    <u>AMENDMENTS AND APPROVALS</u>.    No amendment of any provision of this Agreement, the Note, or any of the Loan Documents, nor consent by Lender to Debtor for any departure thereof, shall be effective unless the same shall be in writing and signed by Lender and Debtor, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.    Further, notwithstanding anything to the contrary in this Agreement, the Note or the Loan Documents, any right Lender has under this Agreement, the Note or the Loan Documents to request, approve, accept, determine, decide, reserve rights, or make any judgment on any matter or issue shall be in Lender's sole and absolute discretion.

16.    <u>NOTICES</u>. All notices, elections or demands permitted or required to be given under this Agreement shall be in writing, signed by or on behalf of the party giving such notice, election or demand, deemed to have been properly given and effective upon being personally delivered, or upon being deposited in the United States mail, postage prepaid, certified with return receipt required, and shall be deemed to have been received on the earlier of the date shown on the receipt or three (3) business days after the postmarked date thereof, to the other party at the address of such other party set forth below or such other address within the continental United States as such other party may designate by specifically designating as a notice of change of address and given in accordance herewith.    No notice of change of address shall be effective until the date of receipt thereof.    Personal delivery to a partner or any officer, partnership, agent or employee of such party at said address shall constitute receipt.    Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been given shall also constitute receipt.    Any such notice, election, demand, request or response shall be addressed as follows:

If given to Lender:                     Truist Bank
                                        214 N. Tryon Street
                                        Charlotte, North Carolina 28202-1078

Copy *(does not constitute notice)* to:     Davis, Pickren, Seydel & Sneed, LLP
                                        285 Peachtree Center Avenue
                                        Suite 2300
                                        Atlanta, Georgia 30303
                                        Attn: J. Bradford Simpson

If given to Owner of Business Assets:     Baskloofs Stone, Inc.
                                        145 Mallory Court
                                        Tyrone, Georgia 30290

17.    <u>GOVERNING LAW AND PARTIES BOUND</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the Collateral, which matters shall be governed by the laws of the state in which such Collateral is located. However, in the event that the enforceability or validity of any provision of this Agreement is challenged or questioned, such provision shall be governed by which whichever applicable federal or state law would uphold or enforce such challenged or questioned provision.    Debtor waives any objection which they may have based on lack of personal jurisdiction, improper venue or forum non conveniens.

18.    <u>SEVERABILITY</u>.  If any clause or provisions of this Agreement is held to be invalid, illegal or unenforceable by any court of competent jurisdiction, the invalidity of such clause or provision shall not affect the validity, legality or enforceability any of the remaining portions or provisions of this Agreement.  If feasible, the offending provision shall be considered modified so that it becomes legal, valid, and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Agreement.

19.    <u>COUNTERPARTS</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.

20.    <u>JOINT AND SEVERAL LIABILITY</u>. If there is more than one debtor, the liability of each debtor under this Agreement shall be joint and several.

21.    <u>SUCCESSORS AND ASSIGNS</u>.    All representations, warranties, covenants, and agreements by or on behalf of Debtor contained in this Agreement shall bind Debtor's successors and assigns and shall inure to the benefit of Lender and its successors and assigns.

22.    <u>WAIVER BY DEBTOR</u>.  In connection with any proceeding under this Agreement, including, without limitation, any action by Lender in foreclosure, repossession or other court process or in connection with any other action related to the Loan, Debtor waives (i) all benefits under any present or future laws exempting any personal property, or any part of any proceeds thereof from attachment, levy or sale under execution; (ii) presentment for payment, demand, notice of demand, notice of non-payment, protest and notice of protest of the Note; (iii) any demand for possession of Collateral prior to commencement of any suit; and (iv) all rights to claim or recover attorney's fees and costs if Debtor is successful in any action to remove, suspend or prevent the enforcement of a judgment entered by confession.

23.    <u>LENDER EXPENSES</u>. Debtor agrees to pay upon demand all of Lender's reasonable costs and expenses, actually incurred, in connection with the enforcement of this Agreement, whether or not an action or claim is filed.  Such Lender costs and expenses include, but are not limited to, Lender's reasonable attorneys' fees and legal expenses incurred in connection with litigation, alternative dispute resolution proceedings, bankruptcy proceedings, appeals, anticipated post-judgment collection services, any fees or costs as may be directed by a court of competent jurisdiction, discharging or paying all taxes, liens, claims of lien, security interests, encumbrances, and other claims at any time levied or placed on the Collateral and paying all costs for insuring,

maintaining, and preserving the Collateral. All such reasonable expenses actually incurred or paid by Lender as set forth herein will become part of the indebtedness secured by the Note and are payable on demand.

24.    <u>INDEMNIFICATION OF LENDER</u>. Debtor agrees to indemnify, defend, and hold Lender and its officers, directors, employees, and agents harmless from and against any and all claims, suits, obligations, damages, losses, costs, expenses (including, without limitation, reasonable attorneys', architect's, and engineering fees), demands, liabilities, penalties, fines, and forfeitures of any nature whatsoever and whenever made that may be asserted against or incurred by Lender or its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by, (i) a breach by Debtor of this Agreement; or (ii) the exercise of the rights and remedies granted to Lender under this Agreement.

This Agreement is executed and delivered on December 15, 2023.

Baskloofs Stone, Inc.,
A Georgia corporation

BY:_____
Izak Gabriel De Beer

TITLE:  President

# SECURITY AGREEMENT

This Security Agreement (this "Agreement") is executed and delivered on December 15, 2023 from Baskloofs Stone, Inc. (collectively, whether one or more, the "Debtor") to Truist Bank ("Lender").

1.    LOAN. Lender is willing to make a loan in the original principal amount of SIX HUNDRED THIRTEEN THOUSAND SEVEN HUNDRED FIFTY AND NO/100 DOLLARS ($613,750.00) (the "Loan") to Baskloofs Stone, Inc., a Georgia corporation (collectively, whether one or more, the "Borrower") subject to the obligations of Debtor contained in this Agreement. The security interest created in this Agreement constitutes continuing collateral security for all of the following obligations, whether now existing or hereafter incurred (collectively, the "Obligations"): (i) the full and prompt payment, when due, of the indebtedness evidenced by that certain promissory note made payable to Lender from Borrower (the "Note"), including all renewals, modifications, and extensions thereof; (ii) the full and prompt compliance with all covenants and agreements of Debtor under this Agreement, the Note, and any other documents evidencing and/or relating to the Loan (collectively, the "Loan Documents"); and (iii) the full and prompt payment, when due, of any and all other present and future indebtedness, liabilities and obligations of Debtor to Lender, including all renewals, modifications, and extensions thereof.

2.    POWER AND AUTHORIZATION. Debtor has duly authorized the execution and delivery of this Agreement to Lender which will not violate any applicable law or agreement to which Debtor is a party to or may be bound or affected by. Debtor represents and warrants to Lender that the following statements are true and correct: (i) the Debtor is organized and/or resides in the State(s) of Georgia; (ii) the Debtor's mailing address(es) is/are Baskloofs Stone, Inc., 145 Mallory Court, Tyrone, Georgia 30290; and (iii) Baskloofs Stone, Inc. is/are the correct legal name of the Debtor as shown on the public organic record of the Debtor's jurisdiction of organization that shows the Debtor to be organized. For any Debtor which is an entity, they are and shall remain duly organized, validly existing and in good standing under the laws of the state(s) in which they were formed and authorized to conduct business, have the full power and authority to carry on its business operations and are duly licensed or qualified under the laws of each jurisdiction in which they operate. Debtor shall not change its name, reorganize, consolidate, merge, or change its jurisdiction of organization/residence unless it has provided Lender thirty (30) days' prior written notice thereof and executed or authorized, at the request of the Lender, such additional financing statements to be filed in such jurisdictions as the Lender may deem necessary in its sole discretion.

3.    GRANT OF COLLATERAL. As security for the full and timely payment and performance of the Obligations, Debtor hereby grants a continuing security interest in all of the following property of the Debtor, being defined as the Collateral, whether now owned or hereafter acquired or arising, wherever located:

a.    *Equipment.* A security interest in all equipment, including furniture, furnishings and other tangible property of every kind, nature and description whatsoever, whether now owned or hereafter acquired by Debtor, including any appurtenances and additions thereto, and substitutions and replacements thereof, wherever located, including all tools, parts and accessories used in connection therewith.

b.    *Trade Fixtures.* A security interest in all of Debtor's trade fixtures and appurtenances thereto, whether now owned or hereafter acquired, and such other goods, chattels,

equipment and other personal property used for a particular trade or purpose of any kind which are affixed or in any manner attached to real property and/or structures thereon, including all attachments, additions and accessions thereto, and replacements thereof, however attached or affixed, together with all tools, parts, and equipment now or hereafter used in connection with the foregoing.

c.  *Inventory.* A security interest in all of Debtor's inventory, including all goods, merchandise, raw materials, goods in process, goods on display, finished goods and other tangible property, wherever located, now owned or hereafter acquired and held for sale or lease or furnished under contracts for lease or consignment, together with such leases and contracts, and all additions and accessions thereto, and all documents evidencing title thereto, and all products and proceeds thereof, whether in the possession of Debtor, bailee or any other person.

d.  *Accounts.* A security interest in all accounts now owned or existing as well as any and all that may hereafter arise or be acquired by Debtor, and all the proceeds and products thereof, including, without limitation, all notes, drafts, acceptances, instruments and chattel paper arising therefrom, and all returned or repossessed goods arising from or relating to any accounts, or other proceeds of any sale or other disposition of inventory.

e.  *Instruments.* A security interest, pledge and assignment in all of Debtor's instruments, whether now owned or hereafter arising or acquired by Debtor, and all products and proceeds thereof.

f.  *Chattel Paper.* A security interest in all of Debtor's interests in chattel paper, lease agreements, contracts and other documents or instruments, whether now owned or hereafter acquired, whether electronic or tangible, evidencing any and all monetary obligations, leases, debts, and/or security interests in favor of Debtor.

g.  *General Intangibles.* A security interest in all general intangibles and other personal property now owned or hereafter acquired by Debtor other than goods, accounts, chattel paper, documents or instruments.

h.  *Documents.* A security interest in all of Debtor's documents, including, but not limited to, agreements, plans, authorizations, permits, consents, licenses, approvals and contracts and other instruments of any kind, whether now owned or hereafter acquired, and all products and proceeds thereof.

i.  *Farm Products.* A security interest, pledge and assignment in all of Debtor's farm products, whether now owned or hereafter arising or acquired by Debtor, and all products and proceeds thereof.

j.  *Deposit Accounts.* A security interest, pledge and assignment in all of Debtor's deposit accounts, whether now owned or hereafter arising or acquired by Debtor, and all products and proceeds thereof.

k.  *Investment Property.* A security interest, pledge and assignment in all of Debtor's investment property, whether now owned or hereafter arising or acquired by Debtor, and all products and proceeds thereof.

l.  *Fixtures.* A security interest in all of Debtor's fixtures and appurtenances thereto, whether now owned or hereafter acquired, and such other goods, chattels, equipment and other personal property affixed or in any manner attached to real property and/or structures thereon, including all attachments, additions and accessions thereto, and replacement thereof, however attached or affixed, together with all tools, parts, and equipment now or hereafter used in connection with the foregoing.

4.    TITLE TO COLLATERAL. Except as disclosed and consented to by Lender in writing, Debtor (i) owns free and clear title to the Collateral, with the exception of liens for taxes not presently due and payable and liens or security interests in favor of Lender; and (ii) has not entered into, granted or permitted the filing or attachment of any liens or security interests against the Collateral that would be prior to, or that may in any way be superior to, Lender's rights in and to the Collateral. Debtor further represents and warrants that title to all Collateral is held in Debtor's exact legal name and is properly reflected herein.

5.    SALE OF COLLATERAL. Debtor shall not sell, lease, transfer or otherwise dispose of any of the Collateral other than in the ordinary course of business without the prior written consent of Lender. If Debtor should desire to sell any of the Collateral outside the course of ordinary business, Lender shall designate a release price or terms of a collateral substitution, along with any other terms and conditions determined in the sole and absolute discretion of Lender. So long as any of the Obligations shall remain outstanding, Debtor shall not transfer any of the Collateral to any other person or entity without the express prior written consent of Lender.

6.    COLLATERAL OBLIGATIONS. Debtor must promptly notify Lender in writing of any change in location of the Collateral, specifying the new location. Upon three (3) days written notice, Debtor shall permit any representative of Lender to visit, examine, inspect and test the Collateral as Lender deems reasonably appropriate to ensure Debtor's compliance with this Agreement, at Debtor's sole cost and expense. Debtor must: (i) maintain the Collateral in good condition; (ii) pay promptly all taxes, judgments, or charges of any kind levied or assessed thereon; and (iii) keep current all rent or mortgage payments due, if any, on premises where the Collateral is located.

7.    AUTHORIZATION TO FILE FINANCING STATEMENTS. Debtor hereby authorizes Lender (including its legal counsel, representative or agent), at any time, to file without the signature of the Debtor, as permitted by law, Uniform Commercial Code financing statements and amendments that describe the Collateral set forth in this Agreement in such jurisdictions as Lender may deem necessary or desirable in order to perfect, amend, continue or terminate the security interests granted by the Debtor under this Agreement. All terms defined in the Uniform Commercial Code of the State(s) of Georgia, as it may be amended from time to time (the "UCC") and used herein shall have the same definitions herein as specified therein. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term shall have the meaning specified in Article 9. Debtor shall execute all documentation requested in Lender's sole and absolute discretion to perfect its security interest in the Collateral pursuant to the UCC, including, but not limited to (i) acknowledgments from any bailee having possession of any of the Collateral confirming that they hold possession of the Collateral on behalf of the Lender, (ii) agreements evidencing the transfer of the Collateral to Lender's control for any investment property, deposit accounts, letter-of-credit rights, or electronic chattel paper; and (iii) other agreements or documentation to ensure the continued perfection and priority of the Lender's security interest in the Collateral and of the preservation of its rights therein, regardless of the effectiveness the Uniform Commercial Code in any jurisdiction. If applicable, Debtor will cooperate with Lender in obtaining a Control Agreement satisfactory to Lender with respect to any deposit accounts or investment property, or in otherwise obtaining control or possession of that or any other

Collateral. Debtor will pay the filing and recording costs of any such documents relating to Lender's security interest.

8.    ATTORNEY IN FACT. Debtor hereby irrevocably appoints Lender the Debtor's attorney-in-fact and proxy, with full authority and in the name of the Debtor, in Lender's discretion, to take any action and to execute any instrument which Lender may deem necessary accomplish the purposes of this Agreement, including, without limitation: (i) to obtain and adjust insurance required to be maintained under this Agreement; (ii) to ask, demand, collect, sue for, recover, compound, receive, and give receipts for moneys due and to become due under or in respect of any of the Collateral; (iii) to receive, endorse, and collect any checks, drafts or other instruments, documents, and chattel paper in connection with this Agreement; and (iv) to file any claims or take any action or institute any proceeding which Lender may deem necessary for the collection of any of the Collateral or otherwise to enforce the rights of Lender with respect to any of the Collateral. Debtor hereby ratifies and approves all acts of said attorney and Lender shall have no liability to Debtor for any act or omission as such attorney. The powers conferred on Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

9.    EVENT OF DEFAULT. An event of default (an "Event of Default") shall be deemed to have occurred hereunder upon any of the following: (i) nonpayment, when due, of any principal, accrued interest, premium, fee or other charge due under the Note; or (ii) the occurrence of any event or condition which constitutes a default under the terms of this Agreement or the Loan Documents. Upon the occurrence of an Event of Default, Lender may declare the entire unpaid balance of the Note and all other indebtedness of Borrower to Lender, including but not limited to accrued interest, fees and other costs to be immediately due and payable without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived. Upon the occurrence of an Event of Default as defined in this Agreement, the Note or the Loan Documents, Lender may declare the entire unpaid balance of the Note and all other indebtedness of Debtor to Lender, including but not limited to accrued interest, fees and other costs to be immediately due and payable without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived.

10.    ADDITIONAL REMEDIES. Upon the occurrence of an Event of Default as defined in this Agreement, the Note, or the Loan Documents, Lender may, in addition to declaring the entire unpaid balance of the Note and all other indebtedness of Debtor to Lender immediately due and payable, take all such other actions deemed necessary in the sole and absolute discretion of Lender, including, but not limited to the following: (i) foreclose upon Lender's security instruments upon the Collateral, in any manner and order available under law and as Lender may determine in its sole and absolute discretion; (ii) enter the premises occupied by Debtor and take possession of the Collateral; (iii) expend any such funds necessary to remedy the Event of Default, with such amounts expended by Lender being added to the indebtedness secured by the Note; (iv) exercise each and every right and remedy granted to Lender under this Agreement, the Note, the Loan Documents, and under any other applicable law or at equity; and (v) exercise any

and all rights of setoff which Lender may have against any account, fund, or property of any kind, tangible or intangible, owned by Debtor. The rights, remedies, powers, and privileges provided for in this Agreement shall not be deemed exclusive but shall be cumulative and shall be in addition to all other rights, remedies, powers, and privileges in Lender's favor at law or in equity. Neither the failure nor delay on the part of Lender to exercise any right, remedy, power, or privilege under this Agreement, the Note, or the Loan Documents upon the occurrence of any Event of Default or otherwise shall operate as a waiver thereof or impair any such right, remedy, power, or privilege of Lender. No waiver of any Event of Default shall affect any later Event of Default or otherwise impair any rights of Lender. No single, partial, or full exercise of any rights, remedies, powers, and privileges by Lender shall preclude further or other exercise thereof. No course of dealing between Lender and Debtor shall operate as, or be deemed to constitute a waiver of, Lender's rights under this Agreement, the Note, or the Loan Documents or affect the duties or obligations of Debtor thereunder.

11.    DISPOSITION OF COLLATERAL.  Lender shall have the right to sell, lease or otherwise dispose of the Collateral following an Event of Default, the proceeds of which will be applied against the amounts owed under this Agreement, the Note and the Loan Documents.  Lender, in its sole and absolute discretion, may (i) accept any form of consideration in exchange for the Collateral; (ii) purchase all or any part of the Collateral at public or, if permitted by law, private sale; and (iii) remove and store the Collateral at Debtor's sole cost and expense.  Prior to any sale of the Collateral, Lender will provide Debtor at least five (5) business days' notice prior to such proposed action, which shall constitute fair and reasonable notice.  Proceeds from any disposition of the Collateral shall be applied in such order as Lender may determine against the following:

(a)    Towards the costs and expenses of taking, storing, preserving, transporting, insuring, repairing, holding and selling the Collateral, including any legal costs and attorney's fees;

(b)    Towards the expenses of satisfying any liens, security interest or encumbrances on or in the Collateral which may be prior to the lien or security interests of Lender; and

(c)    To unpaid interest, then to unpaid principal, due to Lender under the Note along with any other indebtedness due from Debtor to Lender.

12.    RIGHT OF SETOFF.  Following an Event of Default, to the extent permitted by applicable law, Lender shall have a right of setoff, as well as a lien and security agreement against all of Debtor's accounts with Lender, including but not limited to any balance of any deposit, trust or agency account, or any other bank account with Lender.  Lender may administratively freeze all such accounts to protect its rights under this Agreement.

13.    INSURANCE.  Debtor shall maintain insurance against the Collateral in such amounts, in such types and against such hazards and liabilities as may be reasonably required by Lender.  All such policies of insurance shall be in form and substance and with insurance companies satisfactory to Lender, and Debtor shall deliver evidence of same as Lender may request.  Lender shall be designated as Lender's loss payee, or such other designation as Lender may elect under any such policies, as its interests may appear. Debtor hereby assigns to Lender any proceeds of such policies and all unearned premiums thereon and authorizes and empowers Lender to collect such sums and to execute and endorse in Debtor's name all proofs of loss, drafts, checks and any other documents necessary for Lender to obtain such payments.

14.    LIENS AND ENCUMBRANCES.  Debtor shall not incur or permit any encumbrance, pledge or lien upon or against any of the Collateral, except: (i) liens or security interests required by this Agreement; (ii) liens or security interests which have approved in writing by Lender and expressly permitted within the Loan Documents; or(iii) liens for taxes, assessments and other governmental charges not yet due and payable;

15.    AMENDMENTS AND APPROVALS.  No amendment of any provision of this Agreement, the Note, or any of the Loan Documents, nor consent by Lender to Debtor for any departure thereof, shall be effective unless the same shall be in writing and signed by Lender and Debtor, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Further, notwithstanding anything to the contrary in this Agreement, the Note or the Loan Documents, any right Lender has under this Agreement, the Note or the Loan Documents to request, approve, accept, determine, decide, reserve rights, or make any judgment on any matter or issue shall be in Lender's sole and absolute discretion.

16.    NOTICES. All notices, elections or demands permitted or required to be given under this Agreement shall be in writing, signed by or on behalf of the party giving such notice, election or demand, deemed to have been properly given and effective upon being personally delivered, or upon being deposited in the United States mail, postage prepaid, certified with return receipt required, and shall be deemed to have been received on the earlier of the date shown on the receipt or three (3) business days after the postmarked date thereof, to the other party at the address of such other party set forth below or such other address within the continental United States as such other party may designate by specifically designating as a notice of change of address and given in accordance herewith.  No notice of change of address shall be effective until the date of receipt thereof.  Personal delivery to a partner or any officer, partnership, agent or employee of such party at said address shall constitute receipt.  Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been given shall also constitute receipt.  Any such notice, election, demand, request or response shall be addressed as follows:

If given to Lender:                           Truist Bank
                                              214 N. Tryon Street
                                              Charlotte, North Carolina 28202-1078

Copy *(does not constitute notice)* to:       Davis, Pickren, Seydel & Sneed, LLP
                                              285 Peachtree Center Avenue
                                              Suite 2300
                                              Atlanta, Georgia 30303
                                              Attn: J. Bradford Simpson

If given to Owner of Business Assets:         Baskloofs Stone, Inc.
                                              145 Mallory Court
                                              Tyrone, Georgia 30290

17.    GOVERNING LAW AND PARTIES BOUND. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the Collateral, which matters shall be governed by the laws of the state in which such Collateral is located. However, in the event that the enforceability or validity of any provision of this Agreement is challenged or questioned, such provision shall be governed by which whichever applicable federal or state law would uphold or enforce such challenged or questioned provision.    Debtor waives any objection which they may have based on lack of personal jurisdiction, improper venue or forum non conveniens.

18.    SEVERABILITY.  If any clause or provisions of this Agreement is held to be invalid, illegal or unenforceable by any court of competent jurisdiction, the invalidity of such clause or provision shall not affect the validity, legality or enforceability any of the remaining portions or provisions of this Agreement. If feasible, the offending provision shall be considered modified so that it becomes legal, valid, and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Agreement.

19.    COUNTERPARTS.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.

20.    JOINT AND SEVERAL LIABILITY.  If there is more than one debtor, the liability of each debtor under this Agreement shall be joint and several.

21.    SUCCESSORS AND ASSIGNS.    All representations, warranties, covenants, and agreements by or on behalf of Debtor contained in this Agreement shall bind Debtor's successors and assigns and shall inure to the benefit of Lender and its successors and assigns.

22.    WAIVER BY DEBTOR.  In connection with any proceeding under this Agreement, including, without limitation, any action by Lender in foreclosure, repossession or other court process or in connection with any other action related to the Loan, Debtor waives (i) all benefits under any present or future laws exempting any personal property, or any part of any proceeds thereof from attachment, levy or sale under execution; (ii) presentment for payment, demand, notice of demand, notice of non-payment, protest and notice of protest of the Note; (iii) any demand for possession of Collateral prior to commencement of any suit; and (iv) all rights to claim or recover attorney's fees and costs if Debtor is successful in any action to remove, suspend or prevent the enforcement of a judgment entered by confession.

23.    LENDER EXPENSES.  Debtor agrees to pay upon demand all of Lender's reasonable costs and expenses, actually incurred, in connection with the enforcement of this Agreement, whether or not an action or claim is filed.  Such Lender costs and expenses include, but are not limited to, Lender's reasonable attorneys' fees and legal expenses incurred in connection with litigation, alternative dispute resolution proceedings, bankruptcy proceedings, appeals, anticipated post-judgment collection services, any fees or costs as may be directed by a court of competent jurisdiction, discharging or paying all taxes, liens, claims of lien, security interests, encumbrances, and other claims at any time levied or placed on the Collateral and paying all costs for insuring,

maintaining, and preserving the Collateral. All such reasonable expenses actually incurred or paid by Lender as set forth herein will become part of the indebtedness secured by the Note and are payable on demand.

24.    <u>INDEMNIFICATION OF LENDER</u>. Debtor agrees to indemnify, defend, and hold Lender and its officers, directors, employees, and agents harmless from and against any and all claims, suits, obligations, damages, losses, costs, expenses (including, without limitation, reasonable attorneys', architect's, and engineering fees), demands, liabilities, penalties, fines, and forfeitures of any nature whatsoever and whenever made that may be asserted against or incurred by Lender or its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by, (i) a breach by Debtor of this Agreement; or (ii) the exercise of the rights and remedies granted to Lender under this Agreement.

This Agreement is executed and delivered on December 15, 2023.

Baskloofs Stone, Inc.,
A Georgia corporation

BY:_____

Izak Gabriel De Beer

TITLE:  President