**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**NEWNAN DIVISION**

| | | |
|---|---|---|
| **BASKLOOFS STONE, INC. d/b/a DEBEER GRANITE & MARBLE,** | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| **v.** | ) | **3:25-cv-00256-LMM** |
| **TRUIST BANK, INC., and TECHNOLOGY INSURANCE COMPANY d/b/a AMTRUSTCYBER,** | ) | |
| **Defendants.** | ) | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO VACATE ORDER COMPELLING ARBITRATION AND LIFT STAY**

This Court's May 26, 2026 Order (Dkt. No. 34) compelled arbitration of de Beer's claims against Truist based on an arbitration provision that Truist imposed on de Beer through a 2025 change-of-terms notice — months after the very loss giving rise to this lawsuit had already occurred and been reported to Truist by name, by account number, and in real time. No party called to the Court's attention the substantial body of persuasive authority, from California, New Jersey, Indiana, the Sixth Circuit, and the Southern District of New York, holding that a drafter cannot use a general power to "change terms" to reach back and capture claims that have already accrued or become known to it. That omission was understandable at the time; it should not be permanent. De Beer now brings that authority before the

Court, together with two developments that have occurred since the Order was entered: (1) Truist's own conduct in the three months since obtaining the stay, during which it has done nothing to advance the arbitration it fought for; and (2) Truist's issuance, on August 25, 2026, of yet another amendment to its customer agreements — one that, unlike the 2025 version enforced here, expressly disclaims retroactivity and drops the practice of tying continued banking services to acceptance.

Taken together, these facts and authorities show that the arbitration provision enforced against de Beer was not a routine prospective business term but a retroactive device aimed at an already-accrued dispute, and that Truist's post-Order silence confirms it never intended to submit that dispute to a genuine, timely arbitration in the first place. The Court should vacate the May 26, 2026 Order, lift the stay, and restore this case to the active docket.

## PROCEDURAL AND FACTUAL BACKGROUND

### A. The Wire-Fraud Loss and Accrual of de Beer's Claims (April 2025)

De Beer has at all relevant times maintained its operating accounts with Truist. (Dkt. No. 1 ¶ 9.) On April 23, 2025, an unknown third party caused Truist to wire $298,758.00 out of de Beer's account to an unauthorized recipient. (Id. ¶¶ 14, 21.) De Beer discovered and reported the compromise the very next day and

continued to press Truist throughout April 24 and 25, 2025, including written warnings at 2:16 p.m., 3:09 p.m., and 4:45 p.m. on April 25 describing an "attempted hack," an "urgent" situation, and a request that Truist "scan the network." (Id. ¶¶ 15, 23–29.) Truist's own relationship manager and relationship officer corresponded with de Beer in real time about the compromised account and the pending transfer. (Id. ¶¶ 18–19, 25–26.) Notwithstanding those warnings, Truist executed the transfer and did not claw it back. (Id. ¶¶ 30, 34.)

By the close of business on April 25, 2025, then, Truist knew — by name, by account number, and through its own employees' written correspondence — that de Beer had a specific, accrued dispute with Truist over a $298,758.00 loss from de Beer's account. De Beer's negligence, gross negligence, and breach-of-fiduciary-duty claims against Truist all arose from, and accrued as of, that loss. (Dkt. No. 1, Counts I–III.) De Beer did not file suit until December 3, 2025 — more than seven months later. (Dkt. No. 1.)

**B. Truist's 2025 CBSA Notice and This Court's Order Compelling Arbitration**

Truist moved to compel arbitration on January 23, 2026, relying not on the original account agreement de Beer signed, but on a 2025 version of its Commercial Bank Services Agreement (the "2025 CBSA"), which Truist contended de Beer accepted by continuing to use its account after a change-of-terms notice. (Dkt. No. 13; Dkt. No. 16 at 3–4.) That notice stated that

"[c]ontinued use of [de Beer's] account after the effective date constitutes [de Beer's] acceptance of these changes" and that "[a]ll future transactions on your account will be governed by the amended CBSA." (Dkt. No. 16-1 at 3, 9.) The arbitration agreement Truist ultimately enforced originated in the 2023 CBSA and was not, on its face, among the discrete "changes" the 2025 notice specifically identified for de Beer's acceptance. (Dkt. No. 30 at 4–5.)

De Beer opposed the motion, arguing principally that its continued use of the account was not an unequivocal acceptance because de Beer was independently obligated, under separate SBA loan documents, to maintain a deposit relationship with Truist. (Dkt. No. 15; Dkt. No. 30 at 2–6.) On April 27, 2026, the Court denied Truist's motion in part and deferred it in part, directing de Beer to file a sur-reply addressing new evidence Truist had submitted on reply. (Dkt. No. 27.) De Beer's sur-reply, filed May 7, 2026, cited Sevier County Schools Federal Credit Union v. Branch Banking & Trust Co., 990 F.3d 470 (6th Cir. 2021), for the proposition that a lender cannot spring a large package of new terms, including an arbitration agreement, on accountholders through a notice-and-silence mechanism. (Dkt. No. 30 at 6.) On May 26, 2026, the Court granted Truist's motion, finding that de Beer's continued use of its account after the 2025 notice manifested assent to the 2025 CBSA as a whole, and stayed (rather than dismissed) de Beer's claims against Truist pending arbitration. (Dkt. No. 34 at 4–7.)

At no point in that briefing did any party bring to the Court's attention the line of authority — discussed in Part IV.A below — addressing whether, and under what circumstances, a change-of-terms or amendment mechanism may be used to impose an arbitration obligation reaching claims that have already accrued and are already known to the drafter at the time of the notice. Nor did the record before the Court include the comparison between the 2025 notice and Truist's subsequent August 2026 notice discussed in Part I.C below, for the simple reason that the August 2026 notice did not yet exist.

**C. Truist's Silence Since the Stay, and Its August 25, 2026 Notice**

In the three months since the May 26, 2026 Order, the docket reflects no filing, notice, or representation by Truist that it has served a Notice of Pre-Arbitration Dispute, participated in an informal dispute-resolution conference, filed a demand with the American Arbitration Association, or taken any other step toward actually arbitrating de Beer's claims — notwithstanding that Truist's own CBSA arbitration procedures contemplate exactly such steps as prerequisites to arbitration. (See Dkt. No. 13-1 (Mutual Arbitration Agreement, Pre-Arbitration Dispute Resolution provisions).) Truist has, in short, obtained the benefit of removing this dispute from the Court's docket without moving it meaningfully closer to any resolution at all.

On or about August 25, 2026, Truist issued a new notice, titled "Important update to the Truist Online and Mobile Banking Business Service Agreement," to de Beer's controller and principals. Counsel's contemporaneous review of that notice identified two features that distinguish it sharply from the 2025 CBSA notice Truist relied upon in this litigation: first, the August 2026 notice is expressly not retroactive; and second, unlike the 2025 notice — which was structured so that a customer's only alternative to acceptance was to give up its banking relationship with Truist entirely — the August 2026 notice does not condition continued, favorable account service on the customer's acceptance of the new terms. In other words, when Truist wishes to make a routine, prospective amendment to its customer agreements, it says so plainly and does not reach backward. The fact that the 2025 notice did neither of those things is strong circumstantial evidence that it was not a routine amendment at all, but was drafted with the specific, already-known de Beer dispute in view.

## ARGUMENT

### I. This Court Retains Plenary Authority to Revisit Its Interlocutory Stay Order.

"When a district court issues an interlocutory order, the district court has plenary power over it[,] and this power to reconsider, revise, alter or amend the

interlocutory order is not subject to the limitations of Rule 59." Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1315 (11th Cir. 2000). That plenary authority is confirmed by Federal Rule of Civil Procedure 54(b), which provides that any order that does not adjudicate all claims as to all parties "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The May 26, 2026 Order stayed — rather than dismissed — de Beer's claims against Truist. (Dkt. No. 34 at 7.) It is therefore an interlocutory order, no final judgment has been entered as to those claims, and the Order remains squarely within the Court's Rule 54(b) and inherent authority to revise.

Courts confronting the identical situation — a request to revisit an order compelling arbitration, after the order has already been entered — have reached the same conclusion. In Pinela v. Neiman Marcus Group, Inc., 238 Cal. App. 4th 227 (2015), the defendant argued that once the trial court entered an order compelling arbitration, it lost jurisdiction to reconsider that order. The court of appeal rejected that argument, holding that a trial court "may reconsider interim rulings such as compelling or denying arbitration, with or without a change in the law," and affirmed the trial court's decision to vacate its own order compelling arbitration after newly decided authority — Peleg v. Neiman Marcus Group, Inc., 204 Cal. App. 4th 1425 (2012), discussed below — called the enforceability of the

arbitration agreement into question. Pinela, 238 Cal. App. 4th at 236–41. The same principle applies here with even greater force, because this Court's Order is not a final judgment subject to any heightened finality concern, but a stay under 9 U.S.C. § 3 of an ongoing action that remains on the Court's docket.

De Beer recognizes that Local Rule 7.2(E) generally requires motions for reconsideration to be filed within twenty-eight days of an order. That local timing rule, however, does not and cannot displace a district court's independent, broader authority under Rule 54(b) and its inherent power to revise a non-final order at any time before final judgment, particularly where, as here, the request rests in material part on developments — Truist's own post-Order conduct and its August 25, 2026 notice — that did not exist and could not have been raised within that twenty-eight day window. In any event, and even if the Local Rule 7.2(E) standard is applied on its own terms, that standard is satisfied here: courts routinely reconsider orders where, as discussed below, there has been an intervening change in the availability of controlling or persuasive authority, new evidence has come to light, or reconsideration is necessary to prevent manifest injustice.

**II. The Arbitration Provision Truist Invoked Was Retroactively Imposed on an Already-Accrued, Already-Known Claim, and Is Illusory and Unenforceable Under the Weight of Persuasive Authority Not Previously Presented to the Court.**

A substantial and consistent line of authority — arising in the identical banking context and, in several cases, applying identical reasoning to identical facts — holds that a party may not use a unilateral change-of-terms or amendment mechanism to impose or preserve an arbitration obligation reaching claims that have already accrued or become known to the drafter as of the notice. None of this authority was cited to the Court in the briefing that led to the May 26, 2026 Order.

***A. The core doctrine: a change-of-terms clause does not reach claims that have already accrued or become known to the drafter.***

In Peleg v. Neiman Marcus Group, Inc., 204 Cal. App. 4th 1425 (2012), the employer retained a unilateral right to amend or revoke its arbitration agreement on thirty days' notice, with the change applying even to unfiled claims that had already accrued. The court held the agreement illusory, explaining that "[a] unilateral modification provision that is silent as to whether contract changes apply to claims, accrued or known, is impliedly restricted by the [implied covenant of good faith and fair dealing] so that changes do not apply to such claims." Id. at 1465. The following year, the same court applied that rule directly to a bank in

Peng v. First Republic Bank, 219 Cal. App. 4th 1462, 1474 (2013), holding that "[t]he implied covenant also prevents [a drafter] from modifying an arbitration agreement once a claim has accrued or become known to it."

The facts here fall within the very core of that doctrine. Truist's own employees exchanged real-time, written correspondence with de Beer's controller about the compromised account and the pending $298,758.00 transfer on April 24 and 25, 2025 — meaning the specific dispute that gave rise to this lawsuit was known to Truist, by name and by account number, from the moment it accrued. (Dkt. No. 1 ¶¶ 15, 18–19, 23–29.) The 2025 CBSA notice on which Truist later relied to compel arbitration was not issued until sometime thereafter, and nothing in the record reflects that it excluded, or was limited so as not to reach, claims that had already accrued or become known to Truist as of its effective date. Under Peleg and Peng, that is precisely the circumstance in which a change-of-terms mechanism cannot be used to manufacture or preserve an arbitration obligation.

***B. Bank "bill-stuffer" and change-of-terms cases confirm the point.***

The doctrine is not limited to the accrued-claim context; it reflects a broader and long-settled principle, applied specifically to banks, that a generic power to "change terms" does not authorize the drafter to add an entirely new arbitration obligation the customer never bargained for. In Badie v. Bank of America, 67 Cal. App. 4th 779 (1998), the bank relied on a standard change-of-terms provision to

add an arbitration clause through a mailed “bill stuffer,” stating that continued use of the account would make the new provision “apply to all past and future transactions.” Id. at 786 (emphasis omitted). The court held that the bank's unilateral right to modify “terms” of the agreement did not extend to adding “an entirely new [kind of] term, on a subject not addressed in the original agreement and not within the reasonable contemplation of the parties,” particularly where doing so would deprive the customer of the right to a jury trial. Id. at 796. The court further held that the bill stuffer's language was not the “direct, clear and unambiguous language required to alert a customer that by maintaining the status quo he or she is waiving an important constitutional right.” Id. at 806. Discover Bank v. Shea similarly held that a change-of-terms provision silent as to dispute resolution did not contemplate the later addition of an arbitration clause, because a clause depriving a customer of court access must clearly state its purpose. 362 N.J. Super. 200 (Law Div. 2001).

The Indiana Supreme Court reached the same result in the banking context just three years ago. In Decker v. Star Financial Group, Inc., No. 22S-PL-305 (Ind. Mar. 21, 2023), the bank added an arbitration and class-waiver addendum to a checking-account agreement, relying on a clause stating that the bank “may change any term of this agreement.” The Indiana Supreme Court reversed an order compelling arbitration, holding that the account agreement's change-of-terms

clause "did not permit the Bank to add" a wholly new arbitration addendum of that kind. As in Badie and Decker, Truist here relies on a general contractual mechanism for modifying account terms to import an arbitration obligation into a relationship where the specific dispute at issue had already crystallized — an application of the change-of-terms power well outside what such clauses are understood to authorize.

***C. Provisions adopted after a dispute is already known are treated with particular skepticism.***

A related line of authority addresses arbitration provisions added after a specific dispute or lawsuit is already in motion, and confirms that courts will not permit a drafter to manufacture arbitrability once a controversy has become concrete. In In re Currency Conversion Fee Antitrust Litigation, 361 F. Supp. 2d 237 (S.D.N.Y. 2005), several credit-card issuers added arbitration clauses to their cardholder agreements after a putative class action was already pending. The court held that "arbitration clauses engrafted on cardholder agreements after th[e] litigation commenced are not enforceable," while clauses entered into before the dispute arose remained enforceable between the signatories. Id. at 251. The same logic, applied one step earlier in the timeline, supports de Beer's position here: if a drafter cannot use a change-of-terms notice to capture a dispute once suit has been filed, it should not be permitted to do so once the dispute has already accrued and

been reported to the drafter's own employees in writing — which is what the record shows occurred here months before the December 2025 Complaint and, on this record, before the 2025 CBSA notice as well.

***D. Truist's own August 25, 2026 notice corroborates that the 2025 notice was contrived to reach this dispute.***

The comparison between the 2025 CBSA notice and Truist's August 25, 2026 notice is independently probative of the retroactivity problem described above. A financial institution's own contemporaneous practice — what it does when it is, in fact, making a routine, forward-looking change to its customer agreements — is relevant evidence of what a change-of-terms notice is ordinarily understood to accomplish, and by extension, of what departures from that ordinary practice signify. Here, Truist's most recent notice is expressly prospective only, and does not tie continued, favorable account service to a customer's acceptance in the manner the 2025 notice did. The 2025 CBSA notice, by contrast, did both — and did so at a time when Truist already knew, from its own employees' correspondence, that de Beer had a specific, accrued, six-figure dispute with the bank. That contrast supports the inference, consistent with Peleg, Peng, Badie, and Decker, that the 2025 notice's arbitration terms were not offered as an ordinary, prospective business practice but were structured with this dispute specifically in

view — precisely the circumstance those cases hold a change-of-terms mechanism cannot reach.

**III. Independently, Truist's Three Months of Inaction Following the Stay Confirms It Was Never in Good Faith Pursuit of Arbitration, Reinforcing That Relief Is Warranted.**

Section 3 of the Federal Arbitration Act authorizes a stay of litigation pending arbitration only “providing the applicant for the stay is not in default in proceeding with such arbitration.” 9 U.S.C. § 3. Truist's own Mutual Arbitration Agreement contemplates a defined pre-arbitration process — a written Notice of Pre-Arbitration Dispute followed by an informal dispute-resolution conference — as a prerequisite to arbitration proceeding at all. (Dkt. No. 13-1.) Yet in the three months since obtaining the stay it sought, Truist has taken no step, so far as the record or de Beer's counsel is aware, to serve such a notice, request such a conference, or file any demand for arbitration. Having persuaded the Court that this dispute belonged in arbitration rather than in litigation, Truist has done nothing to move the dispute toward the forum it insisted upon.

De Beer does not ask the Court to resolve, on this record alone, a formal waiver or default determination under § 3; that is properly developed on a fuller record if the Court does not vacate the Order on the independent ground set out in Part II above. But Truist's inaction is relevant and mutually reinforcing: it is

difficult to credit an arbitration provision as a genuine, good-faith dispute-resolution mechanism when the party that fought hardest to invoke it has, for three months, done nothing to use it. Considered together with the retroactive character of the 2025 notice and the contrast with Truist's August 2026 notice, Truist's silence supports the conclusion that the arbitration provision enforced by the May 26, 2026 Order functioned here as a means of exiting the litigation, not as a genuine election of an alternative forum — and that vacating the Order serves rather than disserves the FAA's actual purpose of ensuring that disputes committed to arbitration are, in fact, arbitrated.

**IV. Vacating the Order Serves the Interests of Justice and Sound Case Management.**

Finally, no party will be prejudiced by the Court's reconsideration of a purely interlocutory stay in light of authority and facts not previously before it. De Beer's claims against Truist remain stayed, not dismissed, and no arbitration proceeding has been convened, no arbitrator selected, and no fees incurred that vacatur would disturb. By contrast, allowing an illusory arbitration provision to remove this dispute from the Court's docket indefinitely — with no arbitration actually proceeding — serves no party's legitimate interest and leaves de Beer without access to any forum for its claims. Vacating the Order, lifting the stay, and restoring the case to the active docket will allow this litigation, including de Beer's related

claims against co-defendant Technology Insurance Company, to proceed toward resolution on the merits.

## CONCLUSION

For the foregoing reasons, de Beer respectfully requests that the Court vacate its Order of May 26, 2026 (Dkt. No. 34), lift the stay of this action as to Defendant Truist Bank, Inc., and restore de Beer's claims against Truist to the Court's active litigation docket.

Respectfully submitted, this 10th day of September, 2026.

FGP LAW, LLC

/s/ Frank G. Podesta
Frank G. Podesta
Georgia Bar No. 496530
fpodesta@fgplaw.com

555 Sun Valley Drive
Suite N-3
Roswell, Georgia 30076
678.677.5143 (voice)
678.222.0123 (facsimile)
*Attorneys for de Beer*